**STATE of Iowa, Appellee,**

v.

**Jerry Allen MARK, Appellant.**

No. 59676.

Supreme Court of Iowa.

Dec. 19, 1979.

Rehearing Denied Feb. 14, 1980.

**400**

John R. Sandre of Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Faison T. Sessoms, Asst. Atty. Gen., David H. Correll, Black Hawk County Atty. and David J. Dutton, Asst. County Atty., for appellee.

Considered by REES, P. J., and HARRIS, McCORMICK, ALLBEE and McGIVERIN, JJ.

McGIVERIN, Justice.

After jury trial, defendant Jerry Allen Mark appeals his conviction on four charges of first degree murder in violation of sections 690.1–.2, The Code 1975. Defendant urges the following five grounds as reversible error:

1. That he was denied materially exculpatory evidence;

2. That evidence of eight State's identification witnesses should not have been admitted because improper out-of-court identification procedures tainted both the in-court and out-of-court identifications of him by those witnesses;

3. That evidence relative to cigarette butts found in the Leslie Mark farmhouse was inadmissible;

4. That evidence concerning shoe prints on the grounds of the Mark homestead was inadmissible; and

5. That testimony relating to neutron activation analysis of certain bullets was inadmissible.

We affirm.

Sometime between 1:00 and 3:00 a. m. on November 1, 1975, four persons were shot to death in their home at the Leslie Mark farm in Black Hawk County. The four victims were related to defendant. They were Leslie Mark, defendant's brother and a farmer, Leslie's wife Jorjean, their five-year-old daughter Julie and 18-month-old son Jeffery.

On November 10 defendant was charged in four informations with the first degree murder of those persons in violation of sections 690.1–.2, The Code 1975. The cases were consolidated. Prior to trial defendant filed a motion to suppress, a motion in

limine and a motion to produce. The motions were overruled by the trial court. The case was tried before a jury and on June 22, 1976, defendant was found guilty on all four charges.

The State's case connecting Jerry Mark with the killings was based on circumstantial evidence.

From the evidence at trial, the jury could have found the following facts. On October 3, 1975, defendant purchased a white helmet and a used 450cc Honda motorcycle somewhere near his residence in Berkeley, California. The motorcycle was dark brown in color, had a windshield and leg protectors and a luggage box on the back.

Defendant also owned an Iowa registered 100cc Honda motorcycle. At sometime prior to November 1, 1975, he removed the Iowa license plate from his 100cc Honda and put the plate on the 450cc Honda.

On October 20 defendant purchased one box of fifty .38 caliber Winchester Western Long Colt bullets manufactured in 1975, using his Iowa driver's license for identification, from Ken's Sport Shop in Paso Robles, California. He had access to a pistol capable of firing these bullets.

On October 28 defendant bought a black Belstaff riding suit and a pair of motorcycle gloves from a Honda dealership in Berkeley, California.

Jerry Mark left his apartment in Berkeley on the morning of October 29 on his 450cc motorcycle. He traveled through Lovelock, Nevada, on Interstate 80. He proceeded on Interstate 80 through Cheyenne, Wyoming, to Chappell, Nebraska, arriving there on the morning of October 31. Defendant continued east toward Iowa stopping at a Stuckeys Pecan Shoppe in Brady, Nebraska. He left Brady and traveled to Atlantic, Iowa, stopping at the Shamrock Cafe. Mark then proceeded to Newton, where he was observed at another Stuckeys Pecan Shoppe. After leaving Newton, defendant traveled north to Ackley, stopping at a Holiday gas station at approximately 8:00 p. m. on October 31. Ackley is only 36 miles from the Leslie

Mark farm, which is located just west of Cedar Falls, Iowa, on Union Road.

Jerry Mark left Ackley after getting gas and later was at the Leslie Mark farm in the early morning hours of November 1. He cut the wires in the telephone terminal box located across the road from the Leslie Mark farmhouse. In the process he dropped two .38 caliber Long Colt bullets on the ground. He then walked up the driveway to the Mark residence. He walked past the house to a camper, in which Leslie occasionally slept after unloading corn into his storage bin. He returned to the house and using the key that normally hung by the back door, entered the house. At sometime he went to the basement, turned off the power and while there smoked two Marlboro cigarettes.

Jerry Mark proceeded to Leslie's and Jorjean's bedroom, located on the main floor of the house. He shot each of them, Leslie five times, four times in the head and once in the stomach, and Jorjean four times, twice in the head and once in the back, with another shot simply grazing her skin. The wounds were fatal to each.

Defendant also made his way upstairs to Julie Mark's bedroom. He fatally shot Julie twice, once through the heart and once through her right eye. While in her room, he smoked another Marlboro cigarette.

Defendant also went to Jeffery Mark's bedroom and shot the infant two times, once in the left chest and once above the right eye, killing him.

Jerry Mark left the farm and was next observed in Williams, Iowa, sixty-six miles west of the Mark farmhouse, at approximately 5:00 a. m. on November 1. At 7:30 a. m. he was seen in Stuart, Iowa, and between 3:00 and 4:00 p. m. he called his residence in California from Alda, Nebraska.

Other facts will be stated later as necessary for an understanding of the issues raised for review.

■ I. *Exculpatory material.* Defendant initially contends his due process rights were violated when the court denied his

pre-trial motions to produce. In his original motion defendant asked the court to require the State to produce all files of the investigating police agencies for inspection by him for exculpatory, impeaching or inconsistent evidence. In a later renewed and amended motion, defendant asked for the investigative reports and notes of Iowa BCI agents Jutte and Swaim relating to their trip starting November 7, 1975, and their lists of individuals and establishments contacted along Highway 20 west, I-35 south and I-80 west from Iowa into Nebraska in their effort to locate individuals who may have seen defendant on either October 31 or November 1, 1975. This was the route allegedly taken by defendant. The State resisted the motions.

Both motions were overruled. Relative to the renewed and amended motion to produce, the court stated as reasons:

(a) If said request is based upon the defendant's contention that said statements may be impeaching or inconsistent with other statements given by said agents, the rule in *State v. Mayhew*, [170 N.W.2d 608, 614 (Iowa 1969)] provides that such statements shall be made available to the defendant at the conclusion of the direct testimony of such agent; and

(b) The Court's prior in camera review of said statements lead the Court to the conclusion that the information contained therein is not exculpatory.

Defendant had taken the discovery depositions of agents Jutte and Swaim and learned the agents visited every establishment along the route from the Cedar Falls-Waterloo area to Nebraska in their investigative journey. They interviewed approximately 100 persons.

At trial agent Jutte testified they found no one on that trip that recalled seeing defendant.

The officers' trip occurred before defendant was arrested on November 10. The eight identification witnesses discussed in division II were discovered after defendant was arrested.

In reviewing the ruling on defendant's first motion or request to inspect all the police files on the case, we are mindful of what we said in *State v. Hall*, 249 N.W.2d 843, 846 (Iowa 1977): "[I]t is clear from both federal and Iowa decisions not all information in the prosecution's files must be turned over as a matter of constitutional due process." We also there said: "[T]he rule against defense access to all information in the prosecutor's file and dragnet requests for information has been steadfastly maintained." We reaffirm that position here.

Defendant's first motion to produce, which was of the dragnet type, was properly overruled.

■ We next consider defendant's amended motion to produce. When a discovery demand is made, which is resisted by the State, we have indicated it is proper procedure for the trial court to conduct an in camera inspection of the materials sought. *State v. Deanda*, 218 N.W.2d 649, 651 (Iowa 1974). Defendant made no objection to this procedure at the time of the in camera inspection. The State says that under *State v. Gartin*, 271 N.W.2d 902, 909 (Iowa 1978), defendant waived any error by failing to object then to such inspection by the court rather than defendant. Because defendant asked in his original motion for personal inspection of all police files, we are unwilling to say defendant waived error relative to the ruling on his amended motion by not again requesting that he be allowed to view the materials at the time the court made its in camera inspection.

■ However, after agent Jutte testified on direct examination at trial, defendant did not ask to see the notes and statements requested in his amended motion to which defendant then would be entitled under the trial court's ruling. Mark also did not make the agents' notes a part of the record on appeal. Therefore, it is impossible for us to determine whether the information was exculpatory. "It is defendant's obligation to provide this court with a record which affirmatively discloses the error upon which he relies." *State v. Bakker*, 262 N.W.2d 538, 544 (Iowa 1978).

Mark says in his brief he "cannot assert as an absolute that the information contained in those writings was exculpatory to this defendant." He further says "it is reasonable to assume that exculpatory material was contained in those notes."

We are unwilling to make the requested assumption. Due to the inadequate record made by defendant on this point, Mark was waived any error relative to his amended motion to produce. We have nothing further to review in this assignment.

II. *Identification evidence.* We next deal with the out-of-court photographic identifications of defendant by eight witnesses produced by the State at trial.

Shortly after the discovery of the victims' bodies and the arrest of defendant, Iowa law enforcement officials, believing that defendant must have traveled by motorcycle from California to the murder scene in order to have committed the crime, sought to determine whether any individuals in the states of Iowa or Nebraska (east of Chappell, Nebraska) had observed defendant on October 31 or November 1, 1975. Mark told police officers he had only traveled as far east as Chappell, Nebraska. The officials visited numerous gas stations and restaurants in the two states and interviewed hundreds of individuals. In most instances a single photograph of Jerry Mark was shown to the individuals interviewed. Sometimes the persons were asked if they had seen a man on a motorcycle, were asked for his description and then were shown a single photograph of defendant. On other occasions, the potential witnesses were shown the single photograph of Mark and were asked if they had seen him.

Through the investigation the police located the following eight persons who recalled seeing defendant, either on October 31 or November 1, 1975: Leslie Warren, Donald Shearer, Karelyn Kemp, Mary Ann Stinson, Barbara Ann Smith, Delbert Van Hauen, Jayathan Hurd and Rosalie McGinnis. These witnesses were found after the November 7 trip of agents Jutte and Swaim that was mentioned in division I above.

Seven of the eight individuals, who reported they had seen defendant, later traveled to Waterloo, Iowa, and identified defendant from a line-up in December 1975. The eighth person, Karelyn Kemp, viewed pictures of the men who participated in the line-up, and identified defendant. All eight positively identified defendant as the man they had seen on the date and place in question.

These witnesses also made in-court identifications at trial of defendant as the person they had seen at the previous relevant times.

Prior to trial defendant filed a motion seeking to suppress the testimony of these witnesses on the grounds the identification procedures violated his fifth, sixth and fourteenth amendment rights under the United States Constitution. Trial court, after the benefit of hearing, briefs and depositions of the witnesses, overruled defendant's motion. Defendant also objected at trial to the in-court identifications on the same basis.

Defendant claims the court erred in its rulings. He says the utilization of the single photograph procedure by the police denied him due process of law, in that: (1) the showing of the single photograph of defendant to the witnesses was impermissibly suggestive; and (2) this impermissibly suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification under the totality of the circumstances.

The State says that the photographic procedure employed by the police was not unnecessarily suggestive; and even if it was, the totality of the circumstances indicate the challenged identifications were reliable; therefore, the pre-trial identifications and the in-court identifications were admissible.

Our analysis of defendant's claim is in two parts. We first consider whether the single photograph out-of-court identification procedure used by the police was "impermissibly suggestive." *Manson v. Brathwaite*, 432 U.S. 98, 109, 97 S.Ct. 2243, 2250, 53 L.Ed.2d 140, 151 (1977). If we find

the procedure to be impermissibly suggestive, we then must determine whether, under the totality of the circumstances, the suggestive procedure gave rise to " 'a very substantial likelihood of irreparable misidentification.' " Id. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155. "Short of [this] point, such evidence is for the jury to weigh." Id.; State v. Hicks, 277 N.W.2d 889, 893 (Iowa 1979).

A. Impermissibly suggestive. In State v. Ash, 244 N.W.2d 812, 815 (Iowa 1976), we quoted as follows from Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968): " 'It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. * * * This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw . . . .' " "[T]he witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." 390 U.S. at 383–84, 88 S.Ct. at 971, 19 L.Ed.2d at 1253 (1968) (citing P. Wall, Eye-Witness Identification in Criminal Cases 68–70 (1965)).

The Court in Simmons also noted that cross-examination at trial may substantially reduce the danger that photographic identifications may result in convictions based on misidentification because the jury will be exposed to the potential for error when the suggestive procedure is employed. The Court was unwilling to prohibit per se photographic identifications, much like the ones employed by the police in the present case, because of their continued validity in "apprehending offenders" and in "sparing innocent suspects the ignominy of arrest." Id. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

Assuming, without deciding, that the photographic identification procedure employed by the police here was "suggestive," it does not necessarily follow that the procedure was "impermissibly" suggestive.

Defendant claims that whenever a suspect has been arrested and is in custody it is "impermissible" for the State to use a photographic identification procedure such as the one employed here, because a corporeal or physical line-up is available. The State contends a physical line-up is required only in the case where the police have known witnesses to a crime and a known suspect. The State says that where peace officers are looking for unknown witnesses to testify to a defendant's location, which requires that the police travel many miles and interview hundreds of people, it is not "impermissibly" suggestive for the police to use the single photograph identification procedure employed here.

The Court in Simmons held that a suggestive photographic identification procedure was not "impermissible" where a serious felony had been committed, the perpetrators were still at large and the inconclusive clues that law enforcement officials possessed led to the individuals displayed in the photographs. Id. at 384–85, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

It was essential for the FBI agents swiftly to determine whether they were on the right track, so they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities. The justification for this method of procedure was hardly less compelling than that which we found to justify the "one-man lineup" in Stovall v. Denno, supra.

Id. at 385, 88 S.Ct. at 971, 19 L.Ed.2d at 1253–54.

We realize the importance to the State's case of placing Mark east of Chappell, Nebraska, and the resultant necessity for law enforcement officials to use some type of photographic identification procedure in order to determine whether anyone had seen Mark between Chappell and the murder scene in Black Hawk County, Iowa. We also realize that it would be impractical under the circumstances to require the State to transport each person, who had seen a motorcyclist along the investigated routes, to Waterloo to view a line-up in order to determine if he previously had seen defendant.

Obviously it would have been less suggestive for the police to use a photo array instead of the single photograph procedure. We need not determine, however, whether the procedure employed by the police was "impermissible" or unnecessary, because we find all eight of the identifications to be reliable under the totality of the circumstances, such that there was not "a very substantial likelihood of irreparable misidentification."

B. *A very substantial likelihood of irreparable misidentification.* Our analysis of this issue is based on the assumption that the procedure used by the police was both "suggestive" and "unnecessary". *See State v. McManus*, 263 N.W.2d 556, 558 (Iowa Ct.App.1977). This case is controlled by *Manson v. Brathwaite* and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

We must determine whether under the totality of the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." *Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155. As the Court noted in *Brathwaite:*

Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Id.* at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155.

The standard we apply here is fairness as required by the due process clause of the fourteenth amendment to the United States Constitution. *Id.* at 113, 97 S.Ct. at 2252, 53 L.Ed.2d 153.

■ In determining whether there is "a very substantial likelihood of irreparable misidentification" we focus on whether the identification was reliable under the totality of the circumstances. If so, both the pre-trial and in-court identifications are admissible as evidence. *Brathwaite*, 432 U.S.

98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Hicks*, 277 N.W.2d at 892.

■ The reliability factors to consider are set forth in *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411, and are repeated in *Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. They include:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411; *Hicks*, 277 N.W.2d at 892 (citing *Manson v. Brathwaite*); *McManus*, 263 N.W.2d at 558–59; *see State v. Washington*, 257 N.W.2d 890, 894 (Iowa 1977).

■ We now apply the five factor analysis of *Biggers* to the facts of this case. We will discuss several of the witnesses' identifications in full and point out certain relevant factors of the other identifications as they add to our analysis of this issue. There is no need to discuss every identification separately in detail. However, we have carefully considered the reliability factors as they pertain to each witness and find that each identification was reliable and properly admitted into evidence for consideration by the jury.

We first discuss the reliability factors as they relate to the identification of defendant by Mr. Leslie Warren, as his viewing of Mark was the shortest in terms of actual face-to-face observation.

1. The opportunity to view. Leslie Warren, a maintenance man for the Nebraska department of roads, was cleaning the eastbound rest area men's room near Chappell, Nebraska, on the morning of October 31 when he came into contact with defendant. Mr. Warren was in the restroom with defendant for approximately ten minutes and during that time had an opportunity to view Mark's back and, while engaged in a short conversation with defendant, viewed

his face. The face-to-face confrontation lasted just a few seconds.

2. The degree of attention. Warren testified that he carried on a short conversation with defendant. Mark initiated the conversation by asking the witness if he could place some of his belongings in a particular area of the restroom. Warren responded by saying, "Yes, go right ahead." Warren remembered his encounter with defendant because Mark was unusually polite and his duties required him to be on the lookout for illegal campers or hitchhikers, and he first thought Mark was a hitchhiker. The events of this confrontation show that Warren was not merely a casual inattentive observer.

3. Accuracy of the description. Warren described defendant as 5'10" tall, 170–175 lbs., having sandy brown hair with a reddish tinge, a light complexion and freckles, clean shaven and wearing a snowsuit type outfit. The record shows that defendant has sandy brown hair with a reddish tinge, a light complexion and freckles, was clean shaven and owned a "Bellstaff" riding suit of the snowmobile type. Even though the riding suit owned by Mark was black, Warren recalled it as being light in color. He did not see a helmet, gloves or notice the type of shoes defendant wore.

4. Level of certainty demonstrated at the confrontation. Warren was "fairly sure" that the man in the photo was the man he had seen. In addition, when Warren viewed defendant at the line-up in Waterloo and at trial, both times he was positive the man he saw in the restroom on October 31 was Jerry Mark. He testified that his viewing of the single photograph did not influence his identification.

5. Time span. Warren made his identification within approximately one week of his confrontation with defendant. We do not find that this lapse of time before the photo identification by Mr. Warren is sufficient to defeat the reliability of his identification of Jerry Mark, in light of *Biggers*, 409 U.S. at 201, 93 S.Ct. at 383, 34 L.Ed.2d at 412 (lapse of seven months between rape and identification did not defeat reliability of identification by victim).

Mark admitted having had a conversation with this witness, but on November 1, not October 31.

We find Mr. Warren's pre-trial and in-court identifications of Mark to be reliable under the totality of the circumstances and properly admitted into evidence.

■ The identification of defendant by Donald Shearer was at least as reliable as Mr. Warren's. On October 31 at approximately 12:00 noon at Brady, Nebraska, 100 miles east of Chappell, Shearer, a former state trooper, had a full facial view of defendant from a distance of three feet for approximately thirty to sixty seconds, noticed Mark because he appeared too "clean cut" to be riding a motorcycle and thought it was cold to be riding a motorcycle, accurately described defendant and his motorcycle, expressed a high degree of certainty when he made the identification from the photograph, remembered the day's events because it was his son's funeral, and made his identification approximately two weeks after he saw Mark. Shearer remained positive of his identification of defendant both at the line-up and at trial. We find that showing the single photograph of defendant, before Shearer gave his description of the man he had seen, did not defeat the reliability of his identification under the totality of the circumstances. It is important to note that the witness described defendant's motorcycle with surprising accuracy before he was shown a picture of it.

■ We next consider the photo identification of defendant by Karelyn Kemp, a seventeen-year-old waitress at the Shamrock Cafe in Atlantic, Iowa. We discuss her identification because she did not view Mark at a physical line-up and stated on cross-examination that she was not positive the individual she had picked from a photo array, subsequent to her single photograph identification of defendant, was the man she had seen at the cafe.

1. Opportunity to view. On the evening of October 31, Kemp first saw defendant when he was sitting in the fourth or fifth

booth of the cafe waiting to be served. She was his waitress while he was there.[1]

2. Degree of attention. The witness noticed that defendant was "cute" and very polite. She commented that because he was polite he was unlike the truckers who were the ordinary patrons of the cafe. She made a point to mention these things to a co-worker, Mary Ann Stinson.

3. Accuracy of description. Kemp recalled that defendant had reddish to sandy brown hair and was wearing a black snowmobile type suit.

4. Degree of certainty. When law enforcement officials initially showed Kemp a single photograph, she positively identified defendant as the man she had seen. She was later shown a photo array of the individuals that participated in the line-up and she identified defendant. At trial Kemp stated on cross-examination that she was not positively sure that the individual she identified from the photo array was the man she had seen, but she was positive the defendant, seated in the courtroom, was the man she had waited on.

5. Time span. Kemp was shown the single photograph of defendant by police "a couple of days" after viewing Mark.

Mary Ann Stinson, who worked with Karelyn Kemp at the Shamrock Cafe in Atlantic, also identified defendant as the individual in the cafe on October 31. Her identification was clearly reliable when considered in light of the five reliability factors of *Biggers*.

In addition we find that the identifications of defendant by Barbara Ann Smith (6:30–7:30 p. m. October 31, Stuckeys Shoppe, Newton, Iowa), Delbert Van Hauen (7:30–8:00 p. m. October 31, Holiday gas station, Ackley, Iowa), Jayathan Hurd (3:30–5:00 a. m. November 1, gas station, Williams, Iowa), and Rosalie McGinnis (7:30 a. m. November 1, Conoco gas station, Stuart, Iowa) were reliable under the totality of the circumstances and after using the five factor *Biggers* analysis.

All eight of the identification witnesses were thoroughly cross-examined. Their evidence adduced at trial was for the jury to weigh. We cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification" of defendant by any of the witnesses. *Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155; *Hicks*, 277 N.W.2d at 893.

We hold that defendant was not deprived of due process by admission in evidence of the pre-trial and in-court identifications of defendant by these eight State's identification witnesses.

We find no error here.

III. *Shoe print evidence.* Defendant asserts three grounds of error in relation to the shoe print evidence admitted at trial. He first claims that the experts who testified were unqualified. Secondly, he contends that there was not a proper foundation established between the shoe prints and the commission of the crime of the defendant. Lastly, Mark alleges the evidence in relation to the shoe prints was irrelevant.

As part of the State's case in chief, the prosecution introduced photographs of shoe prints found at the scene of the murders. The prints were made by size eleven men's Converse (500) tennis shoes. The individual wearing the shoes walked up the dirt and gravel driveway of the Leslie Mark residence. He then walked to a point east of a toolshed located north of the farmhouse. The individual proceeded to the field located west of the house and the shed, and turned south onto a dirt lane. He walked south until he reached a camper located at the farm's corn storage bin area. Leslie Mark occasionally stayed in the camper when loading corn into the storage bin. The maker of the print then headed back towards the farmhouse and then entered the residence.

---

1. He remained in the restaurant for approximately forty-five minutes according to the testimony of Mary Ann Stinson.

The State did not obtain tennis shoes from the defendant's possession. The shoes that made the prints, like the murder weapon, were never found.

Because the shoes were never found, the State was unable to compare the shoes to the prints made. The State focused upon the physical characteristics of the individual making the prints, and compared those distinctive characteristics to those of the defendant. Dr. William W. Gronen and Dr. Terry K. Lichty made the comparison at trial.

Dr. William W. Gronen is a doctor of podiatry, specializing in surgery and medicine related to the feet. He examined the tennis shoe prints found at the scene of the murders and subsequently examined the defendant by observing his gait. Dr. Gronen testified that all of the characteristics exhibited by defendant were reflected in the shoe prints found at the scene of the crime. The doctor could find no inconsistencies between the shoe prints and gait analysis of Jerry Mark. He was unwilling to state that Jerry Mark, in fact, made the prints found at the scene of the crime; however, it was his opinion that the likelihood of two individuals possessing the same combination of distinctive characteristics was "rather low."

Dr. Terry K. Lichty, a podiatrist specializing in surgery and biomechanics, after conducting a biomechanical examination of defendant, testified at length regarding his objective physical findings and measurements of the defendant. Dr. Lichty testified that after he completed his physical examination of defendant he believed defendant would exhibit the following abnormal or distinctive characteristics when he walked: (1) walk flat footed; (2) toe out, and that the phenomenon would be greater in the right foot than in the left; (3) exhibit a hard heel strike, which would be more pronounced in the right foot; and (4) have propulsive toes.

All of the doctor's predictions were confirmed when he observed Jerry Mark's walk. In response to a hypothetical question, Dr. Lichty testified the defendant's physical characteristics were all consistent with the characteristics exhibited by the maker of the murder scene shoe prints.

It is important to note that Dr. Gronen testified that the Converse tennis shoes purchased by Sergeant Anton, which exactly matched the size and tread of the prints found at the murder scene, were "not a good fit" on the defendant. However, defendant could wear the same size shoes as those making the prints at the scene of the crime.

A. *Experts' qualifications.* Defendant claims that the admission of the expert opinion testimony was improper because both podiatrists lacked the requisite skill, knowledge or experience to render them qualified to express an expert opinion.

The State submits that defendant's challenges to the experts' qualifications were not sufficiently raised in the trial court and, therefore, have been waived. The State also argues, in the alternative, that if the allegations of error have not been waived, the defendant's challenge to the doctors' qualifications to render an opinion on a question asked is a matter that rests within the sound discretion of the trial court.

█ As we have stated, "[w]hen a specific objection is overruled at trial, it is effective on appeal to the extent of the ground specified and no other." *State v. Winquist,* 247 N.W.2d 256, 259 (Iowa 1976); *see also State v. Fitz,* 265 N.W.2d 896, 904 (Iowa 1978); *State v. Hahn,* 259 N.W.2d 753, 759 (Iowa 1977). The requirement that an objection be asserted at trial, which specifically encompasses the grounds raised on appeal, is designed to assure that the trial court is alerted to the questions raised and opposing counsel has the opportunity to remedy the defect. *See State v. Washington,* 257 N.W.2d 890, 895–96 (Iowa 1977). It is well established that matters not raised in the trial court, may not be raised for the first time on appeal. *State v. Jump,* 269 N.W.2d 417, 430 (Iowa 1978); *State v. Rand,* 268 N.W.2d 642, 650 (Iowa 1978); *State v. Holbrook,* 261 N.W.2d 480, 482 (Iowa 1978); *State v. Chatterson,* 259 N.W.2d 766 (Iowa 1977); *Washington,* 257 N.W.2d at 895.

■ In relation to the testimony of Dr. Gronen, no objection was made at trial to his qualifications to render an opinion. Defendant objected to Dr. Gronen's opinion only on relevancy and materiality grounds. At no time did defendant challenge the doctor's qualifications to render his opinion. We therefore find that defendant has failed to preserve error relative to his challenge to Dr. Gronen's qualifications.

■ When the prosecuting attorney asked Dr. Lichty for his opinion, defendant objected on the grounds that "first of all, it assumes facts that are not in this record; secondly, it calls for an opinion and conclusion of the witness without a proper foundation; thirdly, it calls for an opinion that in any event is wholly irrelevant and immaterial with respect to this matter here." The State claims that this objection is too general to preserve for our review the issue of whether the witness qualified as an expert, citing the following cases: *State v. Gartin,* 271 N.W.2d 902, 910 (Iowa 1978); *State v. Hubbs,* 268 N.W.2d 188, 189 (Iowa 1978); *State v. Welsh,* 245 N.W.2d 290, 295–96 (Iowa 1976); *State v. Whitfield,* 212 N.W.2d 402, 410 (Iowa 1973). We agree and find no error here.

We do not intimate we would find merit in defendant's challenges to the qualifications of these witnesses even if error had been preserved.

B. *The proper foundation between the shoe prints and the commission of the crime by defendant.* Defendant contends that no adequate foundation was established between the shoe prints found on the afternoon of November 1 and the murders; therefore, the evidence relating to the shoe prints, including the expert opinion testimony, was immaterial and irrelevant. In particular, defendant asserts the evidence was insufficient to connect him to the prints found at the scene of the murders, and there was no evidence that the prints were made on the night of the crime. The State claims that defendant's contentions are without merit.

■ In order to establish a proper foundational connection between defendant and the crime scene shoe prints, it was necessary that the State establish that similarities existed between the distinctive characteristics exhibited by defendant and the characteristics exhibited by the maker of the crime scene shoe prints. *State v. Sigman,* 220 Iowa 146, 149, 261 N.W. 538, 539 (1935); *State v. Burch,* 195 Iowa 427, 434–35, 192 N.W. 287, 290 (1923); *State v. Norman,* 135 Iowa 483, 485, 113 N.W. 340, 341 (1907). While an absolute or positive identification is not required, there must be a sufficient number of similar identifying characteristics to afford a basis for a reliable comparison. *McDonnell v. United States,* 455 F.2d 91, 95 (8th Cir. 1972); *see Sigman,* 220 Iowa at 149, 261 N.W. at 539. Once the evidence is properly admitted, the weight to be given such evidence is for the jury to determine. *Norman,* 135 Iowa at 485, 113 N.W. at 341.

■ From the record it is clear the State established a proper foundational connection between the defendant, the crime and the prints. Both doctors noted that the maker of the prints and the defendant exhibited the following distinctive characteristics: (1) a hard heel strike at the back outer portion of the shoes; (2) a heel strike more pronounced in the right foot than in the left; (3) propulsive toes; (4) abduction of the feet; and (5) abduction present to a greater degree in the right foot than in the left. Dr. Lichty testified the gait characteristics exhibited by the defendant were rather unusual. He also stated that he has examined thousands of patients and he could not recall ever seeing another individual exhibit the exact same combination of characteristics noted in the defendant. We therefore find a proper foundation was established to connect the shoe prints with defendant.

■ Defendant further contends the shoe print evidence should not have been admitted because there was no evidence that the prints were made on the night of the murders. Mark says that *State v. Sigman* requires the prosecution to conclusive-

ly establish in every case the time at which the prints were made. The State, however, asserts that *Sigman* is limited by its facts. We agree.

In *Sigman* the defendant, who was charged with breaking and entering a garage, was legally at the crime scene the afternoon before the crime. Because defendant had a reasonable explanation for being present at the scene of the crime, the time the shoe prints were made was extremely important. *Sigman,* 220 Iowa at 149, 261 N.W. at 539.

In the present case, Jerry Mark denies being present at the Leslie Mark farm at any time material to the commission of the murders. In addition, other evidence tended to show that the prints could not have been made after the murders. Also, a tread print pattern, identical to the Converse (500) tennis shoe prints found outside the residence, was also found in Julie Mark's bedroom. We find defendant's contention without merit. The time the shoe prints were made was sufficiently shown to warrant submission of the evidence for the jury's consideration.

C. *Relevance.* Defendant contends the expert opinion testimony was irrelevant and its admission amounted to reversible error, and in any event, the probative value of the opinion evidence was outweighed by its prejudicial effect. The State claims that defendant has waived a portion of his assignment of error set forth in this subdivision. The State says that defendant's relevancy objection was not sufficient to preserve error on the allegation of undue prejudice. In addition, the State asserts that the evidence was relevant, and in any event, the probative value of such evidence was not outweighed by its prejudicial effect.

Prior to trial, defendant filed a motion in limine concerning the introduction of shoe print evidence. The motion raised both the question of relevancy and the question of prejudicial effect in relation to the shoe print evidence.

A motion in limine is designed to preclude the premature presentation of evidence. *See State v. Langley,* 265 N.W.2d 718, 721 (Iowa 1978). It is well established that a ruling on the motion, which only grants or denies protection from prejudicial references to challenged evidence, does not preserve the inadmissibility issue for review. *State v. O'Connell,* 275 N.W.2d 197, 202 (Iowa 1979); 265 N.W.2d at 720. It is only where the ruling reaches the ultimate issue, and declares the evidence admissible or inadmissible, that it is a final ruling, which need not again be raised at trial. 275 N.W.2d at 202; 265 N.W.2d at 720. In the present case, the trial court ruled on the motion in limine, but did not reach the ultimate issue in relation to the admissibility of the evidence.

When the experts' testimony was offered, defendant objected, asserting the evidence was irrelevant and immaterial. After preserving those grounds for review, Mark did not further object that the prejudicial effect of the evidence outweighed its probative value.

In *State v. Harmon,* 238 N.W.2d 139, 145 (Iowa 1976), we said: "The objection must be sufficiently specific to alert the court to the objector's theory of undue prejudice." We then held, in *State v. Sparks,* 238 N.W.2d 777, 779 (Iowa 1976), that a relevancy objection is not sufficient to authorize on appeal the allegation of undue prejudice. Therefore, Mark's contention that the probative value of the expert testimony is outweighed by its prejudicial effect has been waived.

We also find that the expert opinion testimony was material to the issue of the murderer's identity. *See State v. Clay,* 213 N.W.2d 473, 477 (Iowa 1973).

Also, the expert opinion testimony was relevant. "The test of relevancy is whether the evidence offered would render the desired inference more probable than it would be without such evidence. Irrelevant evidence is that which has no logical tendency to establish any material proposition."

*State v. Ball,* 262 N.W.2d 278, 279 (Iowa 1978); *State v. Sheffey,* 250 N.W.2d 51, 55 (Iowa 1977); *State v. Sparks,* 238 N.W.2d at 779. The determination to be made under the test for relevancy is a matter for exercise of the trial court's discretion. *Shinrone, Inc. v. Tasco, Inc.,* 283 N.W.2d 280, 288 (Iowa 1979).

■ In the present case, the doctors' analysis and comparison of the unusual characteristics exhibited by both the defendant and the maker of the shoe prints at the murder scene tended to place Mark at the scene of the murders and, thereby, rendered his identity as the murderer more probable than it would have been without the evidence. The mere fact that the doctors were unwilling to identify Mark conclusively as the maker of the prints does not render their testimony inadmissible.

We find no abuse of discretion on the part of the trial court here.

IV. *Cigarette butt evidence.* Mark next asserts that the evidence in relation to the cigarette butts found at the murder scene was irrelevant, immaterial and lacked a proper foundation to be admitted at trial.

The State introduced four Marlboro cigarette butts into evidence. Two were found in the basement of the Leslie Mark home. One was found in Julie Mark's bedroom, underneath the corner of the dresser. The last one was found in another room, put out in a silver ashtray. The State introduced testimony, through Sergeant Anton, that defendant had said during the course of a line-up that he smoked Marlboro cigarettes.

The cigarettes were scientifically tested in order to determine the blood type of the individual who smoked them. The tests revealed that the individual who smoked the cigarettes secreted evidence of his blood type in his saliva. The tests further showed that the individual had type "O" blood.

Other evidence at trial showed defendant's blood type was "O" and that he secreted evidence of his blood type in his saliva.

At trial, defendant established that eighty percent of the total population secrete evidence of their blood type in their saliva and that forty-five percent of the population have type "O" blood.

Deputy Weiser, an officer investigating the crime, admitted that he smoked Marlboro cigarettes and that he extinguished a cigarette butt in an ashtray at the Mark residence. Deputy Weiser has type "A" blood. Robert Harvey, a BCI criminalist, admitted that there was a possibility of error in the interpretation of the tests. Harvey had no explanation why his tests revealed that the person who smoked the four cigarettes had type "O" blood.

■ A. *Foundation.* Defendant argues that the foundation for the admission of the cigarette butts was deficient, thereby rendering the cigarette butts irrelevant. Mark claims that the State failed to establish: (1) the cigarette butts were not present prior to the murders; and (2) the cigarette butts were not accidentally placed at the scene of the murders after the crime.

We find that the State established an adequate foundational connection between the cigarette butts, the defendant and the time of the murders to warrant submission of the evidence for consideration by the jury.

The possibility that the cigarette butts were left in the Mark home prior to the murders was sufficiently negated by the following evidence. None of the residents of the Leslie Mark home smoked cigarettes. No individuals related to the victims, other than defendant and Tom Mark, smoked Marlboro cigarettes. Tom Mark, however, does not secrete evidence of his blood type in his saliva. The cigarette butt found in Julie Mark's bedroom was crushed out by a shoe. The ash of the cigarette formed a print pattern identical to the Converse (500) tennis shoe prints found outside the home, and discussed in division III herein.

The possibility that the cigarette butts were left in the Mark home after the mur-

ders was sufficiently negated by the following evidence. The victims' bodies were discovered by Clark Renner and Dorothy Mark. Neither of these individuals smokes Marlboro cigarettes. The premises were then secured by the police. One cigarette was smoked by Deputy Weiser and accounted for. All other cigarettes smoked by the police officers were placed in one ashtray, located in the kitchen.

The above evidence is sufficient to establish a proper foundation for admission of the cigarette butts. There is no merit in defendant's contention to the contrary.

■ B. *Relevancy and materiality.* Even though the objections "irrelevant" and "immaterial" are often used interchangeably, we have said many times, " 'immaterial' more precisely denotes evidence which is offered to prove a proposition not at issue, while 'irrelevant' denotes evidence which does not logically tend to establish any material proposition." *State v. Clay,* 213 N.W.2d 473, 477 (Iowa 1973); *Trushcheff v. Abell-Howe Co.,* 239 N.W.2d 116, 125 (Iowa 1976). Defendant has preserved for our review the issues of relevancy and materiality in relation to the cigarette butts evidence, and we therefore determine whether the evidence was properly admitted over those objections.

"A determination as to the relevancy and materiality of evidence rests largely in the trial court's discretion." *Hagenson v. United Telephone Company of Iowa,* 209 N.W.2d 76, 80 (Iowa 1973); 239 N.W.2d at 125.

The cigarette butts evidence was obviously material, in that it was offered to prove the identity of the murderer. The identity of the murderer was clearly at issue during defendant's trial.

In addition, because the blood type determination made from the analysis of the cigarette butts found at the murder scene logically tended to establish the identity of the murderer, the evidence was relevant. The evidence rendered the inference that defendant was the murderer more probable than it would have been without the evidence. *See e. g., United States v. Kelly,* 526 F.2d 615 (8th Cir. 1975); *United States v. Kearney,* 136 U.S.App.D.C. 328, 420 F.2d 170 (D.C.Cir. 1969); *Shanks v. State,* 185 Md. 437, 45 A.2d 85 (1945).

Defendant cites *State v. Peterson,* 219 N.W.2d 665 (Iowa 1974), in support of his position. Mark's reliance upon *Peterson* is misplaced. In *State v. Peterson,* defendant was tried for the murder of his fiancee. He was convicted of the included offense of manslaughter. At trial, the State established the blood type of the defendant (Type "A") matched that of the semen found within the body of the decedent. We held that because defendant's blood sample was obtained in violation of his constitutional rights, the blood comparison evidence should not have been admitted and, therefore, reversed the case. In a futile attempt to circumvent the constitutional infirmity, the State argued that the evidence was proper as impeachment of defendant. We noted that the evidence of defendant's blood type was offered before defendant even testified at trial. The evidence was, therefore, not proper impeachment evidence because it is essential that the party to be impeached actually raise the issue while testifying. *Id.* at 672.

Defendant asks us to read *Peterson* as requiring a holding that the blood type evidence admitted from the tests of the cigarette butts was not probative as to the murderer's identity and, therefore, irrelevant. Statements in *Peterson* concerning the probative value of such evidence are clearly dicta which we confine to the circumstances of that case and which have no application in the present case.

■ Evidence should be received if it is logically probative of some matter that needs to be proved, unless there is a clear policy or rule of law that excludes it. Thayer, *A Preliminary Treatise on Evidence at Common Law* 530 (1898); *see* Uniform Rules of Evidence, Rule 402 (1974).

Because defendant smokes Marlboro cigarettes and has type "O" blood, the evidence that someone with type "O" blood, who smoked Marlboro cigarettes, was at the scene of the murders was admissible as one link in the chain of circumstantial evidence tending to prove defendant committed the murders. The better rule is to admit such evidence because it is probative. *See Shanks v. State*, 185 Md. 437, 45 A.2d 85 (1945). We believe the probative value of this evidence was enhanced by its relationship to the other evidence that tended to place defendant at the murder scene. *See United states v. Kearney*, 136 U.S.App.D.C. 328, 329, 420 F.2d 170, 171 (D.C.Cir. 1969); *C. McCormick*, Law of Evidence § 185 at 437 (2d ed. E. Cleary 1972).

Jerry Mark argues that the probative value of the blood type comparison evidence was outweighed by its prejudicial effect. We find no merit in this contention.

We find the following language from *Shanks v. State*, 185 Md. at 449, 45 A.2d at 90, persuasive:

Blood types . . . are now matters of common or ordinary knowledge. Even were they not, if the jury or judge is told that 45% of the population have "O" blood, we cannot assume that this statement would be disregarded and not given its proper weight in determining the evidentiary value of the testimony. Judges and juries must be presumed to have average intelligence at least, and no assumption to the contrary can be made for the purpose of excluding otherwise admissible testimony.

In addition, defendant had every opportunity to neutralize the impact of the evidence by establishing on cross-examination that Mark's blood type is very common among the general population. *United States v. Kelly*, 526 F.2d 615, 622 (8th Cir. 1975).

Defendant further contends that the evidence was not relevant because there was a possibility of error in the analysis of the cigarette butts. Defendant asserts that the BCI report, erroneously showing the cigarette smoked by Deputy Weiser as type "O", casts doubt upon the results reached in the analysis of the cigarette butts found in Julie Mark's room and in the basement of Leslie Mark's home.

The State admits that blood grouping tests are subject to the possibility of error. This possibility was explained to the jury by the State criminalist and was illustrated by the test results of Deputy Weiser's cigarette butt.

The fact the test was subject to the possibility of error, which was fully explained to the jury, only goes to the weight to be given the evidence by the jury. It does not affect admissibility. *See United States v. Garguilo*, 554 F.2d 59, 64 (2nd Cir. 1977) (possibility of error in expert testimony only goes to weight); *see also Castleberry v. State*, 522 P.2d 257, 272–73 (Okl.Crim. 1974); *cf. Shanks v. State*, 185 Md. at 448, 45 A.2d at 88–89.

We find no abuse of discretion by the trial court in admitting the evidence challenged in this division.

V. *Bullets evidence.* Defendant claims that evidence admitted by the trial court concerning certain .38 caliber Winchester Western Long Colt revolver bullets was speculative, irrelevant and lacked a proper foundation.

The evidence showed that such bullets were used to murder the Leslie Mark family. As previously noted, the State produced testimony that on October 20, 1975, a box of fifty such .38 caliber bullets, manufactured by Winchester Western of Alton, Illinois, was purchased at Ken's Sport Shop in Paso Robles, California. The store ledger book stated that the purchaser of the bullets was Jerry Mark.

Federal Bureau of Investigation agent Donald Havekost received from Iowa authorities bullets taken from the crime scene and two boxes of .38 caliber Winchester Western Long Colt bullets purchased by BCI agents from Ken's Sport Shop after

the murders. These two boxes of bullets were similar to the box purchased by defendant. Havekost did a neutron activation analysis on the bullets. The analysis established the type and year of manufacture of the bullets purchased by the BCI, as well as the type and year of manufacture of the bullets used to murder the Leslie Mark family. The neutron activation analysis and other evidence showed all of the bullets, whether purchased by BCI agents from Ken's Sport Shop or recovered from the murder scene, were manufactured in 1975. The neutron activation analysis and other evidence relating to the year of manufacture of the bullets sold to defendant tended to show that Mark, therefore, possessed bullets of the exact same type as those used to commit the offense charged.

A. *Proper foundation for admission of the neutron activation test results.* Defendant says there was no proper foundation laid for admission of the neutron activation evidence. He specifically asserts that the composition categories of the bullets' various elements were arrived at arbitrarily as there was no reason stated in the record for differentiating between compositions; and that there was no showing that the known bullets manufactured in 1975 were unique in elemental composition as no comparison was shown to have been made to bullets produced in other years. The State contends that the foundation requirements, which defendant seeks to impose, are not prerequisites for admissibility. See authorities collected at Annot., 50 A.L.R.3d 117. In addition, the State argues that defendant has failed to preserve error in relation to this issue.

At no time during trial did defendant raise a specific foundational objection to the neutron activation opinion evidence. The defendant's allegation of error may not be heard for the first time on appeal. *State v. Jump,* 269 N.W.2d 417, 430 (Iowa 1978); *State v. Rand,* 268 N.W.2d 642, 650 (Iowa 1978).

B. *Relevance.* Defendant next contends that the evidence related to the analysis of bullets found at the crime scene as well as bullets purchased from Ken's Sport Shop was irrelevant, and even if relevant, its probative value was substantially outweighed by the danger of unfair prejudice. The State asserts that defendant's contentions are without merit. The State first argues that defendant's allegation of error has been waived. Secondly, the State says that the test results, which compared bullets identical to those purchased by the defendant with those found at the murder scene, were relevant and therefore admissible.

When the neutron activation analysis evidence was offered for the jury's consideration, defendant did not object on relevancy or undue prejudice grounds. Defendant's allegation of error has therefore been waived. *State v. O'Connell,* 275 N.W.2d 197 (Iowa 1979); *State v. Sparks,* 238 N.W.2d 777 (Iowa 1976). The fact that defendant filed a motion in limine prior to trial seeking to exclude the evidence on relevancy grounds, which the trial court overruled, does not preserve error on the issue of admissibility. *O'Connell,* 275 N.W.2d at 197.

We have considered all of defendant's many contentions, whether or not specifically discussed, and find no reversible error. The case is affirmed.

AFFIRMED.