**IN THE COURT OF APPEALS OF IOWA**

No. 18-0002
Filed April 3, 2019

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**EARL BOOTH-HARRIS,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Des Moines County, John G. Linn,

Judge.

　　　Defendant appeals his conviction for murder in the first degree.

**AFFIRMED.**

　　　Mark C. Smith, State Appellate Defender (until his withdrawal), and Nan

Jennisch, Assistant Appellate Defender, for appellant.

　　　Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.

　　　Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**BOWER, Judge.**

Earl Booth-Harris appeals his conviction for murder in the first degree. We find the district court properly denied Booth-Harris's motion to suppress based on a claim of an impermissibly suggestive identification procedure. We preserve for a possible postconviction relief action defendant's due process claim raised under the Iowa Constitution and his claim defense counsel should have requested a different eyewitness identification instruction. We affirm Booth-Harris's conviction for first-degree murder.

## I.      Background Facts & Proceedings

On February 16, 2015, Deonte Carter and Terrance Polk had a verbal argument in the front yard of the home of Rita Lewis in Burlington. Carter claimed Polk had taken some items from his home, which Polk denied. Lewis told the men to leave. Carter and Polk then communicated through Facebook and agreed to meet to fight near South Hill Park.

Later that afternoon, Carter arrived at the park with his cousin, Donnell Watson, and a friend, Edward DeWitt. There was evidence Polk was there with some men, including Booth-Harris. According to Watson, Booth-Harris was holding a gun. Carter said, "You going to have to do what you're going to have to do with it," and Booth-Harris shot him several times. When the shooting started, Watson ran away. After a short time, he came back and saw Carter lying in the street. DeWitt called 911. Carter died as a result of the gunshot wounds. He had been shot with a .45 caliber handgun.

During this same time period, Booth-Harris was shot in the leg.[1] He went to his home, leaving drops of blood on the front step and in the home. He changed clothes and had his father drive him to a hospital in Monmouth, Illinois, rather than the hospital in Burlington. Booth-Harris told officers he had been with Polk and had been shot near an argument but denied shooting Carter. During a search of Booth-Harris's home, a .45 caliber shell casing was found near his back door and .45 caliber ammunition was found in a closet. The ammunition found in Booth-Harris's home was of the same type as found at the murder scene.

Watson gave a statement to officers on the day of the shooting. He was shown a photographic array, and Watson said none of the men was the shooter. This array contained a picture of Polk but did not have a picture of Booth-Harris. On February 16, 2015, officers believed Polk might be the shooter. Also, at the time, officers did not know if the shooting of Booth-Harris was related to the shooting of Carter, and an officer showed Watson a single photograph of Booth-Harris, asking, "do you know this person?" Officer Derek Schwandt, who showed the photograph of Booth-Harris to Watson, testified:

> Q. Why did you show him the picture then? A. Well, we just had a shooting in Burlington and there's a subject with a gunshot wound. We don't know if he's a victim. We don't know if he's a suspect. We don't know if he's a bystander, so at that time, we're not sure what his involvement was.

Watson denied knowing the person in the photograph.

---

[1] There was evidence Booth-Harris was shot with a .40 caliber gun. Watson testified when he returned to Carter and DeWitt after the shooting, he saw a gun on the ground. He picked it up and took it to Lewis's home. Later, Watson took officers to the location of the weapon, which was a .40 caliber handgun.

Watson talked to officers a second time on February 18. Detective Josh Tripp produced a photographic lineup. He stated, "I will pick photographs of subjects that look similar to the suspect we have at the time." Detective Tripp did not present the photographic lineup to Watson; Sergeant Chad McCune from the sheriff's office, who had no involvement with the investigation, showed the photographic lineup to Watson. Watson was shown a photographic array, which included a picture of Booth-Harris, and Watson picked him out but said he was not certain because of "stuff that he had on his head, his attire."

Detective Tripp then prepared another photographic array with a different picture of Booth-Harris and pictures of five other individuals. Sergeant McCune also presented this photographic lineup to Watson. Watson picked out the photograph of Booth-Harris, at first stating he was about seventy percent certain and then stating he was one hundred percent certain it was a picture of the shooter. A photographic identification admonition was read to Watson before he was shown each of the photographic arrays.

Booth-Harris was charged with murder in the first degree, in violation of Iowa Code section 707.2 (2015), a class "A" felony. He filed a motion to suppress, claiming the identification procedure using photographic arrays was so unnecessarily suggestive it created an irreparable risk of misidentification and violated his due process rights. The district court denied the motion to suppress, stating, "Based on the level of certainty indicated by Watson during the second and third photographic lineup, the Court does not believe that his observation of the single photograph of Booth-Harris two days prior caused a very substantial likelihood of an irreparable misidentification." The court found the identification of

Booth-Harris in the second and third photographic arrays "are reliable under the totality of the circumstances such that there is not a very substantial likelihood of irreparable misidentification."

Watson identified Booth-Harris in the courtroom as the person who shot Carter. The officer who created the photographic arrays, the officer who presented them to Watson, and Watson all testified about the photographic arrays. The district court denied defendant's motions for judgment of acquittal. The jury found Booth-Harris guilty of first-degree murder. He was sentenced to prison for the rest of his life. Booth-Harris now appeals.

## II.      Eyewitness Identification

Booth-Harris claims the district court should have granted his motion to suppress. He states the procedure involving photographic arrays was impermissibly suggestive and unreliable. He states the procedure violated his federal due process rights. Booth-Harris claims the identification procedures were impermissibly suggestive because Watson was shown his photograph multiple times, Watson was encouraged to inflate his level of certainty, and by showing Watson his photograph alone, it was more likely he would stand out in the photographic arrays.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Smith*, 919 N.W.2d 1, 4 (Iowa 2018) (quoting *State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018)). A defendant has the burden to establish identification procedures were impermissibly suggestive. *State v. Neal*, 353 N.W.2d 83, 86 (Iowa 1984).

A defendant's due process rights are violated if an identification procedure causes "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). "It is the likelihood of misidentification which violates a defendant's right to due process," and this is the basis for the exclusion of evidence. *Id.* We first consider "whether the identification procedure was in fact impermissibly suggestive." *State v. Folkerts*, 703 N.W.2d 761, 764 (Iowa 2005).

If the identification procedure was impermissibly suggestive, "then the court must determine whether, under the totality of the circumstances, an identification made by the witness at the time of trial is irreparably tainted." *Id.* Here, the "focus is on whether the initial identification was reliable." *Id.* We consider, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

We must determine whether "the identification was surrounded by sufficient indicia of reliability so as to render it admissible." *State v. Walton*, 424 N.W.2d 444, 447 (Iowa 1988). When an identification is "not so inherently unreliable so as to offend due process," it is admissible. *Id.* Where there has not been a showing of "a very substantial likelihood of irreparable misidentification," "such evidence is for the jury to weigh." *Manson*, 432 U.S. at 116. "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.*

We note each time before Watson was shown a photographic array, he was read the following paragraph:

> You are about to view a photographic line-up. The person who committed the crime may or may not be included in it. While looking at the photographs, keep an open mind that the individuals may not appear exactly as they did on the date of the crime. Their hairstyles, facial hair, clothing, etc. may have changed. Also, photographs may not always depict the true complexion of a person, who may be lighter or darker than shown in the photo. The officer showing you the photographs has no knowledge of the incident. In the line-up process, the photographs will be shown to you one at a time and are not in any specific order.[2] Take as much time as you need to look at each photograph. Even if you identify an individual, the officer will continue to show you all of the photographs. The officer is not allowed to tell you whether your choice, if you make one, is a suspect in the investigation. Do not tell other witnesses that you have or have not identified anyone.

The evidence shows Watson followed the directives in the photographic identification admonition because when he was shown the first photographic array, which did not include a picture of Booth-Harris, he stated none of the pictures were of the shooter.

Furthermore, the person who created the photographic arrays was not the person who showed the arrays to Watson, and the person who showed the arrays to Watson was not involved in the investigation, so the officer had no knowledge which of the photographs showed an actual suspect in the case. The photographs included in the arrays were specifically chosen due to their similarity to the photographs of Booth-Harris. While it would have been better if Watson had not been shown a single photograph of Booth-Harris,[3] at the time officers were trying

---

[2]  We note the admonition states the photographs will be shown one by one, while Watson was shown a photographic lineup or array.

[3]  When a witness is shown a single photograph there is an increased danger of error in identifying a person. *See State v. Mark*, 286 N.W.2d 396, 404 (Iowa 1979). This danger may be reduced by cross-examination during trial "because the jury will be exposed to the potential for error when the suggestive procedure is employed." *Id.* The Iowa Supreme Court has not adopted a per se prohibition against identification based on a single photograph. *Id.*; *see also State v. Webb*, 516 N.W.2d 824, 829 (Iowa 1994) (finding even

to determine if the shooting of Booth-Harris was related to the shooting of Carter. Watson was asked if he knew Booth-Harris, not whether he believed Booth-Harris was the shooter. Additionally, the second photographic array contained a different picture of Booth-Harris than the third photographic array. We do not find the repetition of photographs of Booth-Harris was impermissibly suggestive.[4]

Booth-Harris also notes when Watson was shown the third photographic array, he initially stated he was seventy percent certain Booth-Harris was the shooter. After some discussion with the officer presenting the photographic array about his level of certainty, Watson said he was one hundred percent certain. As we have stated, the officer presenting the photographic array to Watson was not involved in the investigation, and therefore did not know whether Booth-Harris was a suspect or not. We find the interchange here was not impermissibly suggestive; because the officer presenting the photographic array did not know whether none, one, or several pictures were of suspects, the officer could not have signaled to Watson whether he correctly identified a suspect.[5] Looking at the totality of the circumstances, we find the photographic identification procedure was not unduly suggestive.

---

if an identification based on a single photograph was impermissibly suggestive, the identification was sufficiently reliable to be admissible).

[4] The record does not show whether the single photograph shown to Watson on February 16 was the same as either of the two photographs shown to Watson on February 18 as part of the two photographic arrays. We will not presume the same photograph was used twice in the absence of evidence this was the case. As noted, Booth-Harris has the burden to show the photographic identification procedure was impermissibly suggestive. *See Neal*, 353 N.W.2d at 86.

[5] Booth-Harris cites to *State v. Henderson*, 27 A.3d 872, 899 (N.J. 2011), which states, "Confirmatory or post-identification feedback . . . occurs when police signal to eyewitnesses that they correctly identified the suspect."

However, even if the identification procedure was impermissibly suggestive, we find Watson's identification of Booth-Harris was reliable. Watson had a good opportunity to view Booth-Harris, as Watson was standing next to Carter, who was standing in front of Booth-Harris. Watson's attention was focused on Booth-Harris because he saw Booth-Harris had a gun. Watson's description was largely accurate, although he estimated Booth-Harris was shorter than his actual height. Watson stated he was one hundred percent confident the person he identified in the third photographic array was the shooter. Watson's identification of Booth-Harris from the third photographic array was two days after the shooting.

We conclude "the identification was surrounded by sufficient indicia of reliability so as to render it admissible." *See Walton*, 424 N.W.2d at 447. The identification process was "not so inherently unreliable so as to offend due process," and therefore, Watson's identification of Booth-Harris was admissible. *See id.* We affirm the district court's ruling denying the motion to suppress on federal due process grounds.

### III.     Ineffective Assistance

**A.**     Booth-Harris also claims the photographic identification procedures violated his due process rights under the Iowa Constitution. He urges a per se rule of exclusion for suggestive identification procedures under the Iowa Constitution without the second step of analyzing whether the identification was reliable. He states if reliability is considered, additional factors should be used in addition to those set out in *Manson*, 432 U.S. at 114.

Booth-Harris did not raise this claim before the district court, and it is not preserved for our review. *See State v. Krogmann*, 804 N.W.2d 518, 524 (Iowa

2011) ("But our regular error preservation rules also require the parties to alert the district court 'to an issue at a time when corrective action can be taken.'" (citation omitted)). In the alternative, he claims his failure to preserve error on this issue is due to ineffective assistance of counsel. *See State v. Ondayog*, 722 N.W.2d 778, 784 (Iowa 2006) ("Ineffective-assistance-of-counsel claims are not bound by traditional error-preservation rules."). "Our standard of review for claims of ineffective assistance of counsel is de novo." *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018).

We address claims of ineffective assistance on direct appeal only when the record is adequate. *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) ("[I]f a defendant wishes to have an ineffective-assistance claim resolved on direct appeal, the defendant will be required to establish an adequate record to allow the appellate court to address the issue."). "Only in rare cases will the trial record alone be sufficient to resolve the claim on direct appeal." *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006). Here, no evidence was presented by Booth-Harris or the State in relation to his Iowa Constitutional claim. Also, because the issue was not raised before the district court, the court did not have the opportunity to address it.

If a claim of ineffective assistance of counsel cannot be addressed in a direct appeal, it should be preserved for possible postconviction relief proceedings. *Johnson*, 784 N.W.2d at 198. By preserving the issue, "an adequate record of the claim can be developed and the attorney charged with providing ineffective assistance may have an opportunity to respond to defendant's claims." *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002). We find defense counsel should have an opportunity to explain the strategic or tactical considerations involved in this

case. *See State v. Manning*, 323 N.W.2d 217, 218 (Iowa 1982) ("We have many times held that defense counsel should be availed the opportunity to explain trial conduct in an adversary setting.").

We conclude the present record is not sufficient to address Booth-Harris's due process claims under the Iowa Constitution, and we determine the issue should be preserved for possible postconviction proceedings.

**B.** Booth-Harris also claims he received ineffective assistance because defense counsel did not request a different eyewitness identification instruction. Although the district court submitted the model instruction on eyewitness identification, Booth-Harris claims defense counsel should have requested an alternative instruction or sought to modify the uniform instruction. He claims defense counsel should have requested a more detailed instruction about eyewitness identification.

For the same reasons discussed above, we determine this issue should be preserved for possible postconviction proceedings. No evidence or arguments were presented to the district court concerning Booth-Harris's claim the instruction given was not adequate. Therefore, the district court did not have the ability to make a ruling on the issue. In addition, defense counsel should have an opportunity to discuss the strategy on this issue.

We affirm defendant's conviction for first-degree murder.

**AFFIRMED.**