# IN THE COURT OF APPEALS OF IOWA

No. 16-0876
Filed April 19, 2017

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**DARIUS A. CRAWLEY,**
 Defendant-Appellant.
_____

 Appeal from the Iowa District Court for Black Hawk County, Bradley J. Harris, Judge.

 Darius Crawley appeals from his convictions for robbery in the first degree, burglary in the first degree, and being a felon in possession of a firearm. **AFFIRMED.**

 Mark C. Smith, State Appellate Defender, and Brenda J. Gohr, Assistant Appellate Defender, for appellant.

 Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee State.

 Considered by Danilson, C.J., and Vogel and Vaitheswaran, JJ.

**DANILSON, Chief Judge.**

Darius Crawley appeals from his convictions for robbery in the first degree, burglary in the first degree, and being a felon in possession of a firearm, contending the court abused its discretion and violated Crawley's due process rights in denying his pro se motion to suppress filed the morning of trial. He also contends trial counsel was constitutionally ineffective in failing to file a motion to suppress the photographic lineup identifications of Crawley as one of the two perpetrators by both victims of the offenses. Finding no merit in Crawley's claims, we affirm.

**I. Background Facts and Proceedings.**

For a few days prior to the June 16, 2015 robbery, Lashun Brown said that her boyfriend and roommate, Montavis Keller, had slept with his handgun "[b]ecause we heard we was supposed to get robbed" by Antonio Gantt, whom both Brown and Keller knew. However, Brown asked Keller to move the gun to the dresser because she "didn't feel safe sleeping with it in the bed."

After 3 a.m. on June 16, Brown and Keller were awakened by two men in their bedroom, one holding a shotgun wrapped with electrical tape and the other a knife. The intruders had covered the lower half of their faces. Brown tried to reach for her cellphone but it was taken by one of the robbers. The lights were turned on, and the man holding the shotgun repeatedly demanded to know "[w]here the shit at?" Brown described the man holding the gun as dark skinned, tall, and having a distinctive eye, "Like slanted or whatever. It is messed up." The taller man woke Keller by striking him several times on the head with the butt of the shotgun. The other intruder was searching through the drawers in the

room.  Brown described the second intruder as "heavyset, round . . . bald head and . . . lighter than" Brown.  Keller eventually stated "everything was in the basement."  The heavyset man then left the bedroom.  Keller was bleeding and was allowed to wrap a shirt around his head.  After some time, the taller intruder left the room.  Keller and Brown were able to escape by climbing out their second-floor bedroom window and running to a nearby townhouse belonging to Miss-Sasha Nelson, Brown's friend and Keller's cousin.[1]

Because neither Brown nor Keller had their phones, Nelson called police to report the robbery in progress.  She relayed information from Brown to the 911 operator, including a description of the height and the eye of the one intruder.  Nelson recalled that Brown "kept saying she recognized him, she was trying to remember his name, and she couldn't really think."

Brown and Keller briefly spoke to officers before going to the hospital where Keller received multiple staples to treat his head wounds.  They spoke to officers while at the hospital.  Brown described one suspect to Police Officer Kenneth Schaaf as "approximately 6-4, had dreads[2] and had a slanted or sloped eye," and stated "she knew who it was but couldn't think of the name."

---

[1] Nelson has a child with Antonio Gantt but Gantt "is not around."  When Keller and Brown arrived at Nelson's door, Keller was wearing pajama bottoms and Brown had nothing on.

[2] "Dreads" or "dreadlocks" refer to a hairstyle in which sections of hair are "permanently locked together and cannot be unlocked without cutting."  Shauntae Brown White, *Releasing the Pursuit of Bouncin' and Behavin' Hair: Natural Hair as an Afrocentric Feminist Aesthetic for Beauty*, 1 Int'l J. Media & Cultural Pol. 295, 296 n.3 (2005).  Such hairstyles are "worn predominately (albeit not exclusively) by Blacks and do not require the individual to alter his or her natural hair texture through the use of chemical agents."  Devin D. Collier, *Don't Get It Twisted: Why Employer Hairstyle Prohibitions Are Racially Discriminatory*, 9 Hastings Race & Poverty L.J. 33, 34 n.2 (Winter 2012).  Although the term "dreadlocks" is pervasive in popular culture, it originates from the slave trade; "[w]hen Africans emerged from the slave ships after

Brown and Keller went from the hospital to the police station where they were interviewed in separate rooms. Brown told the investigator, Officer David McFarland, "to look up Darius name or whatever, and he said that he couldn't do that right away. He talked to me about what happened first." Brown was then shown a photographic lineup. From a photo lineup of six similar looking men with locks, Brown picked out the third picture, which was a photo of Crawley. Brown was "100 percent sure it was him." Investigator Christopher Gergen showed Brown a second photo lineup that did not include Crawley—she did not identify anyone in that lineup.

Keller "asked the police officer for Mack 10 and [an]other person's name, and they gave me mug shots." Keller was shown two photo lineups and he identified Crawley as one of the perpetrators from one lineup, and selected a person from the other photo lineup as the other intruder.

Crawley was arrested and charged. He asserted an alibi defense. His girlfriend told officers Crawley was with her the night of the incident.

Crawley was arraigned on July 9, 2015, which resulted in a pretrial-motion deadline of August 18. Crawley was appointed a new attorney on August 4, however. On August 14, Crawley's attorney filed motions seeking an investigator, depositions, and an extension of the discovery deadline. The court

---

months spent in conditions adverse to any personal hygiene, Whites would declare the matted hair that had grown out of their kinky unattended locks to be 'dreadful.'" Ayana D. Byrd & Lori L. Tharps, Hair Story: Untangling the Roots of Black Hair in America 104-06 (2001). Because of this negative connotation, "loc" or "lock" is preferred over the term "dreadlock." *See* Angela Onwuachi–Willig, *Another Hair Piece: Exploring New Strands of Analysis Under Title VII*, 98 Geo. L.J. 1079, 1081 n.2 (April 2010). Therefore, we will refer to this style throughout the body of this opinion as "locks."

granted requests for an investigator and depositions. The record contains no specific ruling on the motion to extend deadlines.

At the pretrial conference held on September 14, one week before trial, no other motions had been filed. Crawley stated at the pretrial conference he would "not waive his ninety-day rights" even though counsel expressed a desire to depose several officers and file a motion in limine.[3] The court agreed depositions could be taken if they could be completed before trial, which was scheduled for September 22. The court continued, Crawley could "move for a continuance . . . beyond the speedy trial" deadline or "proceed to trial without the depositions" given the untimely request.

On September 21, the day before trial, Crawley filed pro se motions in limine and to suppress, challenging the victims' pretrial identifications of him as impermissibly suggestive or tainted.

On September 22, prior to jury selection, the court advised Crawley that if he wanted a full hearing on his motion to suppress, it would allow the late filing of the motion to suppress but only if Crawley waived his right to a speedy trial. Following a brief recess, defense counsel stated Crawley "d[id] not want to waive speedy trial." Crawley complained he had not viewed the recorded or video evidence until four days before trial and depositions were taken just one week earlier. The court again indicated it was willing to give Crawley more time for discovery and have his motion to suppress heard, but that "he can't have it both

---

[3] Crawley's right to be tried within ninety days of the filing of the trial information would have expired on September 23.

ways." Defense counsel reiterated Crawley "is not waiving speedy trial," and the parties proceeded to jury selection.

Counsel later asked for an express ruling on Crawley's motions. The district court ruled the motion to suppress was "an untimely motion," noting Crawley had been "given the opportunity to have a hearing on that and elected to stand upon his right to speedy trial." The court reserved ruling on Crawley's motion in limine. Further record was made on Crawley's motion in limine challenging the victims' identifications as impermissibly suggestive and tainted. The court then ruled that assertions pertaining to Facebook pictures and prior telephone calls all go "to the weight" of the identifications, and that the defense would have an opportunity to cross-examine witnesses on their identifications.

At trial, Brown testified the taller man looked like a man she met at the Family Dollar store about a week before the robbery but she could not remember his name immediately following her and Keller's escape from the townhouse when talking to Nelson. Brown also remembered seeing him "back in the day" in her grandmother's neighborhood. Brown denied looking at any photographs of Crawley before she gave her police statement.[4] She acknowledged the name Darius was mentioned to her, but stated that she recognized him from previously meeting him.

During Brown's testimony she was asked whether, after police came to Nelson's but before going to the hospital with Keller, "At that time had you looked up anything as far as photos or anything like that?" Brown responded:

---

[4] Nelson also denied looking at Facebook before Brown and Keller left for the hospital. It was after Brown returned from the police station that Nelson showed her a picture of a man with a "lazy eye," whom Brown had identified as one of the robbers.

The only thing I did was when we was standing around, I was describing the peoples to the people that was there, like how they looked or whatever, and I believe it might have been Montavis's mom that was on the phone with his brother. His brother's name is Bernell Keller, and asked—describe being how these people looked or whatever, and I said something about Darius's eye. Bernell said like I knew somebody—the only person he knew with an eye like that was Darius, and when he said that, I'm like I did think he did tell me his name was Darius at Family Dollar, but that's about it.

Brown testified further that about one week before a scheduled deposition she received a phone call telling her "to remember I don't know nothing." The day before her deposition, Brown received a Facebook message from "Weather Mann" indicating he was told to deliver the following message to her: "[D]epos tomorrow and . . . you don't know sumthin."[5]

In his testimony, Keller described one of the robbers as taller with a "lazy eye," and the other one as shorter, bald, and muscular. Keller testified he spoke with Bernell by phone from the hospital, "I wanted a name, asked him do he know a taller guy with long hair with a messed up eye." Bernell said he "knew a name Mack 10"—Crawley's Facebook nickname. Keller said he called Bernell "because he knew more people than I do" because he had "been in and out of the jail system." Keller also denied looking at Facebook before they went to the hospital and noted neither he nor Brown had their phones. Keller testified that he "can't forget a face."

---

[5] Police later identified the nickname Weather Mann as Corshundous Love and determined that Love was housed in the same jail pod as Crawley in September. The Facebook message to Brown was sent six hours after Love's release from jail. Gantt was not in jail at the same time as Crawley.

Both Brown and Keller testified to knowing Gantt, the person they had been told was planning to rob them, and that they would have recognized his size and voice.

Crawley was found guilty and now appeals, contending the trial court abused its discretion in refusing to consider his motion to suppress on grounds it was untimely and violated his due process rights in stating Crawley had to waive his speedy-trial rights to pursue the motion to suppress. He also contends trial counsel breached an essential duty in failing to file a motion to suppress the eyewitness identification.

## II. Scope and Standard of Review.

This court reviews rulings on discovery and motions to extend for an abuse of discretion. *State v. Jordan*, 779 N.W.2d 751, 754 (Iowa 2010). An abuse of discretion will be found "only when [the ruling] reflects an exercise of discretion on grounds clearly untenable or to an extent clearly unreasonable." *State v. Ary*, 877 N.W.2d 686, 702 (Iowa 2016).

We review constitutional claims de novo. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

## III. Discussion.

*A. Motion to Suppress/Speedy Trial.* Motions to suppress are to be filed within forty days after arraignment, and depositions are to be taken within thirty days after arraignment. Iowa Rs. Crim. P. 2.11(4), 2.13(6). Motions in limine should be filed nine days before trial. Iowa R. Crim. P. 2.11(4). Such rules "are justified by the need to prevent unfair surprise and unnecessary delays." *Jordan*, 779 N.W.2d at 755 (citation omitted).

Crawley was arraigned on July 9, 2015, which resulted in a pretrial-motion deadline of August 18. However, new counsel was appointed on August 4. When new counsel was appointed, the trial court spoke with Crawley:

> COURT: Do you understand that your speedy trial—you have not waived speedy trial, and your speedy trial deadline is sometime in the later part of September. I believe it's around September 22. Do you understand that?
> DEFENDANT: Uh-huh. Yes.
> COURT: All right. And do you understand that if you do have a new lawyer appointed it may be difficult for that new lawyer to have your case ready to go in time to try your case before you're speedy trial deadline?
> DEFENDANT: Yes.
> COURT: And even having that in mind, do you wish to have a new lawyer appointed to represent you?
> DEFENDANT: Yes, I would still like a new lawyer.

Crawley's new counsel filed motions for an investigator, the taking of deposition on August 14, and to extend discovery deadlines. The court granted the requests for an investigator and the taking of depositions.

On September 14, Crawley again demanded a speedy trial and would not waive his ninety-day speedy trial rights. The court authorized additional depositions so long as they could be completed within the speedy trial deadline.

On September 21, Crawley filed pro se motions, challenging Brown's and Keller's pretrial identifications of him as impermissibly suggestive or tainted by earlier conversations and alleged Facebook photos. In a September 21 order, the court noted Crawley was represented by counsel and the court "will take no further action on the defendant's pro-se motions."

On September 22, the morning of trial, the court indicated that it was willing to give Crawley more time for discovery and have his motion to suppress

heard, but that "he can't have it both ways." Crawley complains this ruling was an abuse of the court's discretion and denied him due process. We disagree.

Trial courts have the discretion to extend discovery and motion deadlines upon a showing of good cause. *Id.* But in ruling on such matters, "courts must strike a careful balance between the interest in economizing discovery and the rights afforded criminal defendants." *Ary*, 877 N.W.2d at 704 (citation omitted). In light of Crawley's insistence he would not waive his ninety-day speedy trial rights, the district court had little choice but to proceed with trial.

In any case, following voir dire, defense counsel asked for an express ruling on Crawley's motions. The court ruled the motion to suppress was "an untimely motion," noting Crawley had been "given the opportunity to have a hearing on that and elected to stand upon his right to speedy trial."

The next morning, further record was made on Crawley's motion in limine challenging the victims' identifications as impermissibly suggestive and tainted. The court's ruling that that the Facebook allegations and prior calls all go "to the weight" of the evidence was not unreasonable and the defense had ample opportunity to cross-examine the witnesses on their identifications.

> The criminal process includes many situations which require a defendant to make difficult judgments regarding which course to follow. *Chaffin v. Stynchcombe*, 412 U.S. 17, 31-32 (1973). Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not always forbid requiring him to choose. *Id.* The deciding factor is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.

*State v. Gay*, 526 N.W.2d 294, 297 (Iowa 1995). The district court did not abuse its discretion, and Crawley was not denied fundamental fairness here.

*B. Ineffective-Assistance Claim.* Crawley's claim of ineffective assistance of counsel is premised upon this court adopting a heretofore unrecognized standard of eyewitness identification reliability. We will not find trial counsel provided constitutionally deficient representation under such circumstances.

In order to prevail on a claim for ineffective assistance of counsel, Crawley must show (1) his trial counsel failed to perform an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Failure to prove either element by a preponderance of the evidence is fatal to an ineffectiveness claim. *State v. Polly*, 657 N.W.2d 462, 465 (Iowa 2003). Counsel is presumed to have performed in a competent manner. *Maxwell*, 743 N.W.2d at 196.

Crawley acknowledges Iowa courts have consistently followed the two-step federal due process "reliability" standard requiring courts to determine: (1) whether the out-of-court identification procedure was "impermissibly suggestive," and (2) if so, whether the suggestive procedure, under the totality of the circumstances, gave rise to "a very substantial likelihood of irreparable misidentification." *See Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Neil v. Biggers*, 409 U.S. 188, 199 (1972) (setting forth five reliability factors to consider under the totality of the circumstances); *see also State v. Folkerts*, 703 N.W.2d 761, 763–64 (Iowa 2005); *State v. Webb*, 516 N.W.2d 824, 829–30 (Iowa 1994); *State v. Neal*, 353 N.W.2d 83, 87–89 (Iowa 1984); *State v. Mark*, 286 N.W.2d 396, 403–07 (Iowa 1979); *State v. Salazar*, 213 N.W.2d 490, 493–95 (Iowa 1973). Crawley argues this approach has been criticized and urges the adoption of an approached outlined by the Supreme Court of New Jersey in

*State v. Henderson*, 27 A.3d 872, 920 (N.J. 2011). We leave that task to our supreme court. *See State v. Eichler*, 83 N.W.2d 576, 578 (Iowa 1957) ("If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves."); *Riniker v. Wilson*, 623 N.W.2d 220, 227 (Iowa Ct. App. 2000) (declining to adopt rule of procedure and stating such a change was "up to the legislature and/or our supreme court"); *see also State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent.").

Suffice it to say that trial counsel did argue that Brown's and Keller's identifications were faulty and vigorously cross-examined the witnesses on those identifications. Brown's identification was based on her independent knowledge of Crawley. The only delay in providing the photo lineups was the stop at the hospital for Keller's medical care. Moreover, the jury was specifically instructed on how to evaluate the reliability of eyewitness identifications in Instruction 19. Crawley has failed to establish the probability of a different outcome, which dooms Crawley's ineffectiveness claim.

We affirm.

**AFFIRMED.**