# IN THE COURT OF APPEALS OF IOWA

No. 18-0266
Filed January 9, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DONALD EDWARD McINTYRE,**
        Defendant-Appellant.
_____


Appeal from the Iowa District Court for Floyd County, Christopher C. Foy, Judge.


The defendant appeals his conviction for robbery in the first degree. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Considered by Potterfield, P.J., Doyle, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**POTTERFIELD, Presiding Judge.**

Donald McIntyre appeals his conviction for robbery in the first degree. He maintains (1) trial counsel provided ineffective assistance by failing to object to hearsay statements, to the admission of shoeprint evidence, to instances of prosecutorial misconduct, and to the definition of "armed" in a jury instruction; (2) the court erred in including language pertaining to a knife in the dangerous-weapon instruction; and (3) the trial court should have granted his motions for judgment of acquittal and for new trial based on the weight of the evidence.

## I. Background Facts and Proceedings.

On December 27, 2015, around 6:00 or 6:15 a.m.—while it was still dark outside—Dennis Gifford returned home after driving to a local gas station to buy the Sunday newspaper. As Gifford was standing in his driveway, a man he did not recognize walked up to him and abruptly began hitting him in the head with a small bat that had tape wrapped around it. The blows knocked Gifford to the ground, and the man began to tussle with Gifford, announcing several times that Gifford owed "big money." During the struggle, Gifford was able to get on top of the man for a short time. However, while Gifford was restraining the man and deciding what to do next, the man was able to roll Gifford over and get back on top. From this position, the man held the bat against Gifford's neck and applied pressure; Gifford almost lost consciousness. Gifford was able to retrieve some cash from his wallet, which he then offered to the man. As the man reached to take the money, Gifford got up and ran away. He locked himself in his cabinet shop and called 911. The man fled.

After officers arrived, Gifford provided a description of the man, stating he was approximately six-foot tall, with a slender, unshaven face, and was wearing a black jacket with a tied hood as well as a black stocking cap. The officers recovered a twelve-inch knife and a long bat—approximately fourteen inches—which had black electrical tape wrapped around it. The items were on the ground near Gifford's broken glasses, coffee cup, and newspaper. Officers also photographed certain shoeprints in the snow they believed belonged to the assailant.

Gifford went to the emergency room for treatment of his injuries. While he was there, officers created a photo lineup with pictures of men who lived in the area based on Gifford's description of the man. The lineup included a picture of McIntyre. McIntyre's home is located about one block from Gifford's, and there is a direct line of sight from McIntyre's front door to Gifford's home. Gifford did not make an identification.

The next day, Officer Bradley Bilharz was at a local gas station when he saw McIntyre in the store, wearing his hood up with a stocking cap on. Officer Billharz recognized McIntyre from the lineup and thought he matched the description given by Gifford. He followed McIntyre outside and took a photo of a boot print McIntyre left in the snow outside the gas station.

On January 5, 2016, officers executed a search warrant of McIntyre's home. The officers noted and photographed McIntyre's large weapon collection, including bats and knives with a similar electrical tape application as the weapons recovered at the scene. Additionally, the officers noted a pair of boots sitting by McIntyre's door that they believed had the same tread as the prints at the scene. McIntyre

denied the boots were his, stating they were too small for his feet, but he was able to put them on when officers asked him to try. McIntyre's wife, Michelle, claimed the boots were hers and she was able to put them on, but she had to loosen the laces in order to get them on over the foot brace she wears. When the boots were first located by the door, the laces were pulled tight.

On January 26, Gifford was shown the same lineup he had been shown on the day of the incident; the second time, he identified McIntyre as the assailant.

In November, the Department of Criminal Investigations issued a report stating it had tested both the knife and bat recovered from the scene. The major contributor of DNA from the swab from the knife handle was consistent with the known DNA profile of McIntyre, with the probability of finding that profile in a population of unrelated individuals less than one out of one hundred billion. Additionally, the partial contributor of DNA from the swab taken from the handle of the bat was consistent with the known DNA profile of McIntyre, with the probability of finding that profile in a population of unrelated individuals less than one out of seventy-six billion.

McIntyre was charged with robbery in the first degree.

A multi-day jury trial took place in late 2017. The State called Gifford, who recounted the attack and again identified McIntyre as the attacker. The State also called Thomas Downer, who testified that he had been with McIntyre off and on the morning of the attack. He stated that after McIntyre and Michelle had a fight, McIntyre started acting odd and saying "something about a job." He testified that a few days after the attack, McIntyre told him he had been at someone's house, there had been a struggle—during which time he had thrown a bat—and that he

was missing a knife. On cross-examination, the State questioned Downer about his change in testimony from his deposition, when he testified that at the time he left McIntyre's house, McIntyre was shoeless, wearing a pair of shorts and t-shirt, and "didn't look like he was about to be going anywhere." Downer agreed his testimony was different, stating his deposition testimony was a result of his and McIntyre's close relationship and "ha[ving] each other's backs type of thing." Downer also agreed that between his deposition and trial testimony, he had reached an agreement with the prosecutor's office that if he cooperated and testified truthfully at trial, his probation would not be revoked for an unrelated charge.

McIntyre testified in his own defense. He maintained he was home sleeping during the attack; he argued Gifford had mistaken his identify and the weapons from the scene—though he had likely owned them at one time—were brought there by one of the many people who had previously traded, purchased, or stolen weapons from him. McIntyre called several witnesses who testified they believed McIntyre was home asleep during the time of the attack, but no one was able to testify that they had witnessed him doing such, though McIntyre's wife testified she saw him sleeping on the couch at 6:30 a.m.

McIntyre was convicted as charged and later sentenced to a term of incarceration not to exceed twenty-five years. He appeals.

## II. Discussion.

### A. Ineffective Assistance of Counsel.

McIntyre maintains his trial counsel provided ineffective assistance in a number of ways. We review claims of ineffective assistance de novo. *See State*

*v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). McIntyre bears the burden to show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *Id.* at 495 (citation omitted). Additionally, he asks that we look to the cumulative effect of counsel's errors to determine whether he was prejudiced by counsel's errors. *See id.* at 500 ("Iowa recognizes the cumulative effect of ineffective assistance of counsel claims when analyzing prejudice under *Strickland.*"). As always when a defendant makes a claim of ineffective assistance on direct appeal, "[i]f the challenged actions of counsel implicate trial tactics or strategy, we will not address the issue until fully developed." *Id.* In such cases, we preserve the claim for possible later consideration. *See State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018) ("If the development of the ineffective-assistance claims in the appellant brief was insufficient to allow it consideration, the court of appeals should not consider the claim, but it should not outright reject it.").

### 1. Hearsay Testimony.

McIntyre contends his trial counsel provided ineffective assistance by failing to object to inadmissible hearsay testimony by two witnesses.

Hearsay is a statement that, "(1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). "Hearsay . . . must be excluded as evidence at trial unless admitted as an exception or exclusion under the hearsay rule or some other provision." *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006) (alteration in original) (citation omitted).

The first error McIntyre alleges is counsel's failure to object to Officer Bradley Billharz's testimony that McIntyre's friend and alibi witness Garrett

Tegtmeier had told the officer, "Don [McIntyre] did it." Specifically, Officer Billharz testified:

> Q. And then on January 7 of 2016, you did an interview of Garrett Tegtmeier; is that correct? A. Yes.
> Q. Did you do anything else as part of that interview? A. I just asked him if he'd seen anything happening in the area or heard anything about the assault. He did not hear or see anything about what happened. At one point of our interview he goes Don did it. And I said Don did what. And he didn't say anything else then. So I don't know what he meant by that.

McIntyre maintains counsel breached an essential duty because the testimony was meant to prove that McIntyre was the assailant and no exception to the hearsay rule made the statement admissible.

The State concedes "that a hearsay objection at that point would likely have been sustained, and the testimony would have been struck." Yet the State urges us to find that McIntyre was not prejudiced by the failure, arguing the State could have got the same evidence properly admitted later by calling Officer Billharz in rebuttal to Tegtmeier's testimony that he believed McIntyre was home sleeping at the time the incident occurred and did not have contrary information regarding McIntyre's whereabouts.

We have no information regarding why counsel did not object. And at the time Officer Billharz made the hearsay statements, Tegtmeier had not yet testified that he believed McIntyre was home at the time of the attack. We will not presume counsel was engaged in a trial tactic. *See State v. Tompkins*, 859 N.W.2d 631, 643 (Iowa 2015) (concluding counsel could have objected to a statement and preserving the issue for later adjudication); *Clay*, 824 N.W.2d at 500–01 (concluding record was insufficient to resolve ineffective-assistance-of-counsel

claim on direct appeal when record was not developed as to trial counsel's state of mind with respect to counsel's failure to object).

We also will not presume facts not in the record to establish that McIntyre was not prejudiced. While the State might have been able to recall Officer Billharz in order to offer the disputed testimony in rebuttal, we will not take for granted the fact that the State would have done so. We acknowledge that "[i]n considering whether the admission of hearsay evidence is reversible error, we have held that notwithstanding the presumption of prejudice from the admission of such evidence, the erroneously admitted hearsay will not be considered prejudicial if substantially the same evidence is properly in the record." *Newell*, 710 N.W.2d at 19. But that is the not the situation here. Thus, we preserve this claim for possible postconviction relief. *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) (holding it is the court's role to determine whether a claim of ineffective assistance can be addressed on direct appeal).

Next, McIntyre challenges his counsel's failure to object to testimony from the State's witness Thomas Downer. Downer testified as follows:

> Q. Did you check or look for him at his own residence? A. Um, a few hours passed before I did. Um. And then I asked Michelle if he was home because he was—because how he was acting. And she said no.
> . . . .
> Q. Now, Mr. Downer, was Donald McIntyre ever located that morning? A. Um, it would have been early—early morning that he was located. Michelle—Or he had gotten a phone call. I'd gotten a phone call from Tegtmeier saying that [McIntyre] was at his house when Tegtmeier got home.
> Q. Did you learn what [McIntyre] had been doing while he was missing. A. Um, no, not till after—it was after that. Or.
> Q. Were you asked to go over to Tegtmeier's house? A. Yes.
> Q. By whom? A. Michelle. To pick up clothing of [McIntyre]'s.

Q. Who—who actually picked up [McIntyre] from Tegtmeier's?
A. It would have been Michelle.
Q. But you were asked to go over to Tegtmeier's house to pick up clothing? A. Yes.
Q. Did you do so? A. No.
Q. Did you go over to Tegtmeier's house? A. Yes.

The State asserts that Downer's testimony Michelle called him and asked him to go to Tegtmeier's to pick up clothing is not hearsay because it is not a statement. *See State v. Weaver*, 608 N.W.2d 797, 805 (Iowa 2000) ("To be hearsay, an out-of-court utterance must be a 'statement.'"). We disagree. While the statement at issue was allegedly initially posed as a question, there is an implied assertion that McIntyre had discarded clothing at Tegtmeier's home. *See State v. Frederiksen*, No. 15-0844, 2016 WL 4051655, at *8 (Iowa Ct. App. July 27, 2016) (holding evidence was properly excluded when it was offered to imply speaker's knowledge of some other fact, as "[t]he doctrine of implied assertion applies both to the literal truth of the statement as well as any implied truth or implied assertions" (citing *State v. Dullard*, 668 N.W.2d 585, 595–96 (Iowa 2003))); *but see Weaver*, 608 N.W.2d at 805 ("[T]he victim's inquiry about her sister was not hearsay because it was not an assertion."). "If the expressed assertion is insincere, such as a fabricated story, the implied assertion derived from the expressed assertion will similarly be unreliable." *Dullard*, 668 N.W.2d at 594. "Allowing inferences that depend on the truth of the explicit assertion denied opposing counsel the opportunity to cross-examine, which is what hearsay disallows." *Frederiksen*, 2016 WL 4051655, at *8.

Additionally, counsel could have objected to Downer's testimony that when he called Michelle "right before daybreak" on the day of the attack and asked if

McIntyre was home, she responded, "No." In essence, Downer testified that Michelle told him McIntyre was not home the morning of the attack, and the State presumably wanted this testimony admitted to prove McIntyre was not at home—in contrast to his and Michelle's testimony.

Counsel also could have objected to Downer's testimony that "[he]'d gotten a phone call from Tegtmeier saying that [McIntyre] was at his house when Tegtmeier got home." The State urges us to find the statement falls within the present sense impression exception to the hearsay rule. *See* Iowa R. Evid. 5.803(1) (providing "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the rule against hearsay). But it is not clear from Downer's testimony whether Tegtmeier's call to Downer was contemporaneous with his getting home and finding McIntyre there or if Tegtmeier later called Downer and reported McIntyre had been at his home when he arrived earlier. The present sense impression "is based upon the theory that the substantial contemporaneity of event and statement negative the likelihood of misrepresentation." *State v. Flesher*, 286 N.W.2d 218, 220 (Iowa Ct. App. 1979).

While we conclude counsel could have objected to the aforementioned testimony, the record is not adequate for us to decide McIntyre's claims of ineffective assistance. It is possible Downer's testimony Tegtmeier called him and reported McIntyre was at his home was a contemporaneous call that falls within the present sense impression. Additionally, Downer's testimony about Michelle's request to pick up McIntyre's clothing may have been admissible to explain Downer's conduct of going to Tegtmeier's home. *See State v. Mitchell*, 450

N.W.2d 828, 832 (Iowa 1990) ("When an out-of-court statement is offered, not to show the truth of the matter asserted but to explain responsive conduct, it is not regarded as hearsay.").

### 2. Shoeprint Evidence.

Next, McIntyre asserts trial counsel provided ineffective assistance by failing to object to the shoeprint evidence—including evidence of prints from the scene, the photograph of the print made by McIntyre at the gas station, and a photograph of the tread of the boots found at McIntyre's home. He argues the State was not required to establish the proper foundation for the admission of the shoeprint evidence and he was prejudiced by this failure.

McIntyre asserts the State was required to "[e]stablish that similarities existed between the distinctive characteristics exhibited by the defendant and the characteristics exhibited by the maker of the crime scene shoe prints." But the present facts are distinguishable from each of the cases McIntyre relies upon.

In *State v. Mark*, the police located a number of shoeprints related to a murder investigation. 286 N.W.2d 396, 407 (Iowa 1979). The State determined the prints were made by a size eleven men's Converse (500) tennis shoe, but the shoes that made the prints were never found. *Id.* at 408. "Because the shoes were never found, the State was unable to compare the shoes to the prints made. The State focused upon the physical characteristics of the individual making the prints, and compared those distinctive characteristics to those of the defendant." *Id.* The doctor of podiatry who testified as an expert examined the prints and the defendant's gait, ultimately opining that "all of the characteristics exhibited by defendant were reflected in the shoe prints found at the scene of the crime." *Id.*

The doctor would not testify it was the defendant who had left them, but said "it was his opinion that the likelihood of two individuals possessing the same combination of distinctive characteristics was 'rather low.'" *Id.*

Here, an expert did not opine on the likelihood McIntyre made the prints found at Gifford's house. Rather, pictures of the prints found at Gifford's home and the gas station, as well as a photograph of the sole of the boots found at McIntyre's home were admitted into evidence for the jury to determine whether the boots could have made the prints found at the scene. Through cross-examination, McIntyre's attorney was able to minimize the significance of the evidence by asking questions regarding how common the boots were and whether similar boots were sold locally. Additionally, no one asserted that the specific boots found at McIntyre's were the ones that made the prints at the scene; witnesses opined the boots could have made the prints as the tread on the boots appeared to match the tread from the prints found at the scene.

In *State v. Signon*, the court ruled the evidence of a shoeprint found on a piece of paper at the scene of a burglary was not admissible because even though the print was made by the same type of shoe the defendant was wearing at the time of his arrest, there was no evidence when the print was made. 261 N.W. 538, 539–40 (Iowa 1935). In this case, the shoeprint at the scene was made by an impression in snow. While we do not have any evidence regarding how recently the snowfall occurred, the present facts are distinguishable because of the impermanent nature of snow—compared to the paper found in *Signon.* Additionally, there was more than one print, and officers were able to track a number of footprints from near the spot of the scuffle. An officer testified, "And I

[saw] where the subject just wasn't walking from the scene. They were like somebody was running at a good pace. There was a large distance in between the footprint. And they went to the northwest from the scene area." Gifford's wife, Glenda, testified she helped officers identify the area where she would expect to find shoeprints from her family and the area where only she usually walked; it was in the second area that police found the larger prints made by someone apparently fleeing.

Moreover, the shoeprint evidence is not the State's only evidence tying McIntyre to the scene. Gifford identified McIntyre in a photo lineup and then ten months later, the crime lab identified DNA consistent with McIntyre's on both the knife and bat recovered from the scene. "[T]he requirements for admissibility of footprint identification testimony have been held to be less stringent where there is other evidence connecting the defendant with the crime scene." *State v. Campbell*, 326 N.W.2d 350, 354 (Iowa 1982).

McIntyre has not established that his counsel breached an essential duty by not objecting to the admission of the shoeprint evidence.

### 3. Prosecutorial Misconduct.

McIntyre maintains his trial counsel provided ineffective assistance by failing to object to a number of statements made by the prosecutor during rebuttal closing arguments that amounted to prosecutorial misconduct.[1]

---

[1] Claims relating to a prosecutor's behavior at trial have historically been referred to as prosecutorial misconduct. However, our supreme court adopted a distinction "between incidences of prosecutorial error and prosecutorial misconduct" and noted "[a] prosecutor who has committed error should not be described as committing misconduct." *State v. Schlitter*, 881 N.W.2d 380, 393–94 (Iowa 2016). We apply the same multi-factor test outlined in *State v. Graves*, 668 N.W.2d 860 (Iowa 2003) either way. *Id.* at 394. Both

Because McIntyre raised the claim of prosecutorial misconduct under the framework of ineffective assistance, "our first step is to assess whether the record demonstrates, as a matter of law, the existence or absence of a meritorious due process violation." *Graves*, 668 N.W.2d at 869. "Thus, we must consider whether the prosecutor was guilty of misconduct in the particulars identified by [the defendant] and whether the record shows [the defendant] was prejudiced, i.e., denied a fair trial." *Id.* If McIntyre is able to establish both elements of his due process claim, he "will have proved that the assertion of such claim at the time of the prosecutor's misconduct would have had merit." *Id.* at 870. Only then do we proceed to consider whether his claim can meet the requirements of ineffective assistance. *See id.*

"If it is determined defense counsel failed to raise a meritorious issue, we must then consider whether an attorney performing within the range of normal competency would have made an objection and/or requested a mistrial." *Id.* "If there is no possibility that trial counsel's failure to act can be attributed to reasonable trial strategy, then we can conclude the defendant has established that counsel failed to perform an essential duty." *Id.* "If trial counsel's conduct might be characterized as a reasonable trial tactic, then [the] ineffective-assistance claim must be preserved for trial in a possible postconviction relief action." *Id.* "[S]hould the defendant's claim survive to this point, [we] assess whether the record permits a determination of the prejudice prong of the ineffective-assistance claim." *Id.*

---

McIntyre and the State use the term "prosecutorial misconduct" throughout, so we do the same.

We must consider each of the comments McIntyre complains of to determine whether his claim has merit. Misconduct occurs when the prosecutor seeks to tarnish defendant's credibility or boost that of the State's witnesses "through unnecessary and overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury." *State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006). As we undertake our review, we note that each of the comments took place during closing argument and are guided by "the principle that, in closing arguments, counsel is allowed some latitude." *Id.* at 554 (altered for readability).

First, McIntyre asserts it was improper for the prosecutor, after listing physical evidence that supported Gifford's testimony, to state, "Again, evidence that corroborates what he's saying." Second, McIntyre challenges the prosecutor's statement, "Also [Gifford's] identification of [McIntyre] has been consistent." McIntyre next challenges the statement, "[Gifford] knows that [McIntyre's] the man who attacked him. There's no question about that." Similarly, he challenges the statement, "Mr. Gifford only wants the man who attacked him to be held responsible. And that man is the defendant. He knows who attacked him."

Additionally, McIntyre challenges some of the prosecutor's statements to the jury about Downer's testimony.

> [Defense counsel] tried to characterize like the State has bribed [Downer] to say something. But [Downer] testified that the State never told him what to say. In fact, the State told him to tell the truth.
> And he didn't get out of prison. That was never even on the table.
> He originally told you he had a 45-day jail sentence and he did serve nine days of the sentence.
> He also didn't say he's scot-free. He's still on probation.

> And so it's not that he was bribed.
> And he was never told what to say.
> *In fact, if I was going to feed somebody a story to tell, I would have made up a lot better story than what he gave me.*
> There's still gaps. There's still holes.
> And so he wasn't fed a story. *He's telling the truth.*
> And there's facts and things that he was asked questions about that could have helped the State's case and he said I don't know or he would say no.
> *He was telling me the truth when he testified.*

(Emphasis added.)

McIntyre argues these statements establish that the prosecutor misstated facts, expressed her personal beliefs, and improperly discussed the credibility of various witnesses. *See Id.* at 554 ("[C]ounsel has no right to create evidence or misstate facts."); *Graves*, 668 N.W.2d at 874 ("A prosecutor may not . . . express his or her personal beliefs."); *State v. Martens*, 521 N.W.2d 768, 772 (Iowa Ct. App. 1994) ("A prosecutor may not . . . express or imply his or her personal belief in the truth or falsity of the testimony of a witness.").

First, we consider the prosecutor's statement that Gifford's identification of McIntyre has been consistent. McIntyre takes issue with this as a misstated fact because Gifford did not identify McIntyre the first time the photograph lineup was presented to Gifford. We do not understand the prosecutor's statement to be a misstatement or misleading; rather, we believe the prosecutor was emphasizing the point that Gifford—while unable to first identify his attacker—never identified someone other than McIntyre. The description Gifford gave police was used to create the lineup, which included McIntyre; Gifford identified McIntyre as the attacker the second time he saw the lineup, which DNA testing several months later seemed to corroborate; and Gifford identified McIntyre again from the witness

stand. Additionally, the prosecutor's statement there was "no question" Gifford knows that McIntyre's the one who attacked him was made after the prosecutor listed each of the above pieces of evidence and again reiterated Gifford had never identified a person other than McInytre as the perpetrator. *See Graves*, 668 N.W.2d at 874 ("A prosecutor 'is entitled to some latitude during closing argument in analyzing evidence admitted in trial.' Moreover, a prosecutor may argue the reasonable inferences and conclusions to be drawn from the evidence." (citation omitted)).

We see no issue with the prosecutor's statement that evidence recovered at the scene corroborates Gifford's statements about how the attack occurred. The prosecutor was not expressing a personal belief but rather was pointing to physical evidence that supported Gifford's testimony. *See Carey*, 709 N.W.2d at 557 (determining the prosecutor neither relied upon her personal opinion nor vouched for the victim's credibility when she "highlight[ed] for the jury the evidence in the record that show the inconsistent and evasive nature of the defendant's testimony" by comparing "his testimony with that of victim's, whose story was unchanging," which was proper). "[M]isconduct does not reside in the fact that the prosecution attempts to tarnish defendant's credibility or boost that of the State's witnesses; such tactics are not only proper, but part of the prosecutor's duty." *Id.* at 556.

Finally, we consider the prosecutor's statement that Gifford "only wants the man who attacked him to be held responsible. And that man is the defendant. He knows who attacked him." When placed in context, the prosecutor was responding to McIntyre's claim that he had been misidentified or set up, emphasizing that

Gifford did not have a motive to implicate McIntyre if he was not the attacker. In full, the prosecutor argued:

> And when we talk about motives, what motive does Dennis Gifford have to make up the story. What motive does he have to try to frame [McIntyre] if that's not the man who attacked him. He didn't know him before then. There's been no evidence, no testimony that he had some sort of ax to grind or would want [McIntyre] to get in trouble. Quite the opposite. Mr. Gifford only wants the man who attacked him to be held responsible. And that man is the defendant. He knows who attacked him.

If defense counsel had objected to any of the prosecutor's statements regarding Gifford and his testimony, the objections would not have been sustained. Thus, McIntyre cannot prove breach of duty. *See Tompkins*, 859 N.W.2d at 637 ("[W]here a claimant alleges counsel's failure to pursue a particular course breached an essential duty, there is no such duty when the suggested course would have been meritless.").

Next, we consider McIntyre's arguments about the prosecutor's statements regarding Downer's testimony, including twice asserting Downer told the truth when he testified at trial and that she would have made up a better story for him if she had told him how to testify. While a prosecutor may not personally vouch for the credibility of a witness, "a prosecutor is still free 'to craft an argument that includes reasonable inferences based on the evidence and . . . when a case turns on which of two conflicting stories is true, [to argue that] certain testimony is . . . believable.'" *Graves*, 668 N.W.2d at 876 (alteration in original) (citation omitted). Moreover, the prosecutor's statements were directly responsive to statements made by defense counsel during his closing, when he stated:

> Thomas Downer. We submit that his testimony should be discounted because he lied under oath by his own admission.

> At his deposition. Basically everything he said on his deposition, most of it was a lie.
>
> It's hard to figure out with a guy like that whether he's lying then or whether he's lying now.
>
> Plus he was bribed in essence with substantial jail time. You know, possibly prison time he got out of on his probation revocation. And as a result of that, he changes his story.
>
> So I think you have to view with great suspicion the testimony of, first of all, somebody that's getting out of jail and prison time in return for their testimony.
>
> And, second of all, somebody that is a proven liar that has admitted that he has lied.
>
> So we—we feel that he made up that story. He's lying to save his own skin.

"A prosecutor is not required to sit mute and let the defendant's interpretation of evidence go unchallenged." *State v. Thornton*, 498 N.W.2d 670, 676 (Iowa 1993). Under these circumstances, we cannot say the prosecutor's statements were improper.

Because McIntyre cannot prove that the prosecutor's statements violated his right to due process, he cannot establish that trial counsel providing ineffective assistance when he allowed the statements to pass without objection.

### *4. Definition of "Armed" in Jury Instruction.*

McIntyre maintains his trial counsel provided ineffective assistance when he failed to object to the court's definition of "armed" in a jury instruction. The instruction at issue states:

> As used in these instructions, a "dangerous weapon" is any device or instrument designed primarily for use in inflicting death or injury, and when used in its designed manner is capable of inflicting death. It is also any sort of instrument or device actually used in such a way as to indicate the user intended to inflict death or serious injury, and when so used is capable of inflicting death. You are instructed that a knife with a blade exceeding five inches in length is, by law, a dangerous weapon.

> For purposes of these instructions, a person is "armed" with a dangerous weapon when it is in his possession and available for immediate use.

On appeal, McIntyre maintains the definition of "armed" incorrectly states the law and creates confusion. He argues the instruction needed to include a mens rea component, asserting the jury should have been instructed that to find McIntyre was "armed," they must find he had a conscious and deliberate keeping of the dangerous weapon on his person. *See State v. Ray*, 516 N.W.2d 863, 865 (Iowa 1994).

In order to be successful under this argument, McIntyre must establish a reasonable probability the jury made findings of fact that produced a conviction under this instruction but would not have under the instruction he now maintains should have been given. *See State v. Hanes*, 790 N.W.2d 545, 551 n.2 (Iowa 2010). McIntyre has made no such argument. He has not pointed out any evidence in the record that would support the jury finding that McIntyre was the assailant but that he did not know he was carrying a twelve-inch knife on his person. Additionally, McIntyre has made no argument regarding the alternative—that the jury could have concluded the bat was a dangerous weapon and McIntyre had deliberately and consciously kept the bat on his person.

Because this argument is not sufficiently developed for our consideration, we preserve this claim of ineffective assistance for a later date. *See Harris*, 919 N.W.2d at 754.

### *5. Sufficiency of the Evidence.*

McIntyre challenges the sufficiency of the evidence to support his conviction, arguing there is not substantial evidence to identify him as the

perpetrator of the robbery. He did not raise the argument with the rest of the ineffective-assistance claims, but because trial counsel failed to preserve the argument he now raises with a specific motion for judgment of acquittal,[2] *see State v. Brubaker*, 805 N.W.2d 164, 174 (Iowa 2011), and McIntyre asked us alternatively to consider the claim under the ineffective-assistance framework, we do so now.

We have little trouble finding there is substantial evidence to support that McIntyre was the perpetrator. Gifford identified McIntyre as the assailant, both in a photograph lineup and from the witness stand. *See State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) ("We find that the alleged victim's testimony is by itself sufficient to constitute substantial evidence of defendant's guilt."). Additionally, later DNA testing of the bat and knife recovered from the scene established that DNA consistent with McIntyre's was on both weapons. Because any motion for judgment of acquittal based on sufficiency of the evidence to support identity would have been denied, trial counsel was not ineffective for failing to raise the issue.

### 6. Cumulative Prejudice.

---

[2] McIntyre asserts his argument has been preserved because McIntyre "made a motion for judgment of acquittal which alleged the specific grounds that are alleged on appeal and specified which elements of the crime that were insufficiently supported by the evidence, which the court overruled." In fact, at the close of the State's evidence, McIntyre stated:

> Well, the first motion is the Motion for Directed Verdict slash Motion to Dismiss on the grounds that the evidence taken as a whole and viewed in the light most favorable to the State—or to the State does not establish guilt beyond a reasonable doubt.

While we treat a motion for directed verdict as one for judgment of acquittal, *see State v. Adney*, 639 N.W.2d 246, 249 n.2 (Iowa Ct. App. 2001), McIntyre did not renew his motions after the defense rested and he never made a more specific comment regarding his challenge to the sufficiency of the evidence.

We are to evaluate a defendant's claims of ineffective assistance by determining if the cumulative effect of the alleged errors resulted in *Strickland* prejudice, but this record is inadequate for us to do so here. Thus, we preserve for later adjudication McIntyre's claims of ineffective assistance regarding counsel's failure to object to hearsay testimony and to the definition of armed within the dangerous-weapon instruction. *See State v. Lepon*, No. 16-0117, 2017 WL 4049829, at *13 (Iowa Ct. App. Sept. 13, 2017) (preserving defendant's multiple claims of ineffective assistance where inadequate record prevented the court from resolving a number of claims on direct appeal in order to properly evaluate the cumulative prejudicial effect); *State v. Keys*, No. 15-1991, 2017 WL 1735617, at *9 (Iowa Ct. App. May 3, 2017) (same).

**B. Inclusion of "Knife Language" in Jury Instruction.**

McIntyre maintains the trial court erred when it concluded there was sufficient evidence the attacker was armed with a knife to instruct the jury, "You are instructed that a knife with a blade exceeding five inches in length is, by law, a dangerous weapon." "Alleged errors in the submission or refusal to submit jury instructions are reviewed for correction of errors at law." *State v. Tipton*, 897 N.W.2d 653, 694 (Iowa 2017).

We agree with the trial court there is sufficient evidence to instruct the jury that a knife over five inches long is per se a dangerous weapon. Gifford testified that during the scuffle with his attacker, he "felt like there was some leather there too" and though he never saw a knife, "while [he] had ahold of the stick, [he] could feel something leather also." When officers arrived on the scene, Gifford showed them where the struggle took place; the officers noted Gifford's eyeglasses, his

spilled cup of coffee, and a newspaper blowing in the wind. In the same vicinity, they found "a club laying on the ground, about a 15-inch bat. . . . There was a knife laying there too and a sheath. The knife was laying next to the club." Based on this evidence, the jury could infer the knife was brought to the scene by the attacker, and if the jury determined he was armed with it, it was necessary for the jury to be advised the twelve-inch knife recovered at the scene satisfied the definition of a dangerous weapon. *See Alcala v. Marriott Int'l, Co.*, 880 N.W.2d 699, 707 (Iowa 2016) ("Iowa law *requires* a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." (emphasis added) (citation omitted)).

### C. Weight of the Evidence.

McIntyre argues the trial court abused its discretion when it denied his motion for new trial based on the weight of evidence not supporting the jury's verdict. *See State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006) (providing we review weight-of-the-evidence claims for abuse of discretion because of the trial court's "broad discretion in ruling on a motion for new trial"). In raising this argument, McIntyre again focuses on whether the evidence supports that he was the perpetrator of the robbery.

"Unlike the sufficiency-of-the-evidence analysis, the weight-of-the-evidence analysis is much broader in that it involves the questions of credibility and refers to a determination that more credible evidence supports one side than the other." *Id.* The court made credibility findings in reaching its decision to deny McIntyre's motion, stating:

[The court] also finds that the—the greater weight of the evidence actually supports the verdict that the jury had reached.

While Mr. McIntyre did offer alibi that he wasn't—it wasn't him at the scene because he was someplace else, he was in his home, the alibi witnesses themselves were not consistent.

And ultimately it was the jury's province to make a determination of which testimony they found to be most credible.

And given the opportunity Mr. Gifford had to observe and see his attacker, even though the lighting was— was somewhat faint given the time of day and the distance that this took place from any electronic lamps or lights, he—Mr. Gifford had a good opportunity to observe his—his attacker.

If I recall, one of the distinguishing features of his attacker was the eyes and just the fact that the eyes of his attacker were—were somewhat set in to the attacker's face. I don't know if he specifically used the word sunken, the eyes were sunken, but I—that was the impression the court got from Mr. Gifford's testimony. I do think that's a distinguishing feature of Mr. McIntyre, that his eyes are set back distinctively.

Mr. Gifford was able to identify Mr. McIntyre in a photo lineup that was shown to him after he had an opportunity to address his immediate injuries from the attack.

Just on balance, the Court finds that the greater weight of the evidence, does support the verdict.

(Altered for readability). Based on our review of the record, "[t]his is not the rare case in which the verdict runs contrary to the weight of the evidence." *State v. Benson*, 919 N.W.2d 237, 243 (Iowa 237). Thus, we cannot say the district court exercised its discretion on grounds clearly untenable or to an extent unreasonable when it denied McIntyre's motion for new trial. *Id.* at 241.

**III. Conclusion.**

McIntyre did not establish his claims for ineffective assistance, that there was insufficient evidence to instruct the jury the knife recovered at the scene meets the legal definition of a dangerous weapon, nor that the verdict is contrary to the weight of the evidence. Thus, we affirm. We preserve for postconviction relief his

claims trial counsel was ineffective for failing to object to instances of hearsay testimony and the definition of "armed" within a jury instruction.

**AFFIRMED.**